## THE GOLDEN GROVE.

*(Circuit Court, D. Delaware.   October 6, 1882.)*

1. ADMIRALTY—COLLISION—STEAM AND SAILING VESSEL.

When a sail-vessel and a steam-vessel are moving in directions which may involve risk of collision, the latter must keep out of the way of the former. It is the right and duty of the sailing vessel to keep her course, except under "special circumstances" rendering a departure from it necessary to avoid immediate danger.

2. SAME—REV. ST. § 4234—TORCH.

Section 4234, Rev. St., which provides that "every sail-vessel shall, on the approach of any steam-vessel during the night.time, show a lighted torch," etc., is as applicable to navigation on the sea as to inland navigation.

3. SAME—EVIDENCE TO SUSTAIN DECREE.

The evidence in this case showing that no fault was to be imputed to the brig, but that the steamer was in fault, the decree of the district court should be affirmed.

In Admiralty.

*John C. Dodge* and *E. G. Bradford, Jr.,* for libelants.

*Coudert Brothers* and *Levi C. Bird,* for claimants.

McKENNAN, C. J.   This is an appeal from the decree of the district court of Delaware, awarding damages against the steamer Golden Grove, resulting from a collision with the brig Kremlin.

The following conclusions of fact are the result of the pleadings and evidence in the cause:

(1) On the morning of Tuesday, July 9, 1878, the hermaphrodite brig Kremlin, laden with a cargo of sugar, was on a voyage from Cienfuegos to Boston, and at 1 o'clock was about 30 miles southerly from the island of Nantucket, on the coast of Massachusetts, her course being N. E. by E., with a south-west wind, and a speed of six and a half knots per hour; the course of the steamer being W. ½ S. (2) The weather was calm, an ordinary breeze blowing and the night not dark, but somewhat hazy, not, however, to prevent the stars from being visible. (3) The brig carried the regulation lights,—a green one on her starboard, and a red one on her port side,—which were set in her main rigging, were trimmed, and burning brightly, and were of the character required by the rules of navigation. (4) The main rigging is not only the place in which the side lights are generally set in vessels of the class of the brig; but it is also the place from which they can be seen best. (5) As soon as the steamer was sighted by the brig, which was when they were some two miles apart, the steamer bearing about two and a half points on the starboard bow of the brig, the captain of the latter caused a torch-light to be exhibited on her starboard side. After burning for several minutes it was extinguished, and was twice relit, the brig meanwhile steadily maintaining her course without any variation. (6) This torch-light was distinctly seen by the lookout on the steamer, whereupon her helm was put hard a-port, and was so kept, changing

her course about five points, but her speed was not reduced until the collision was imminent, when an ineffectual attempt was made to that end. (7) The steamer had a single lookout on her deck, from which was visible the starboard light of the brig, inasmuch as it was unobstructed and was burning brightly, and as the mast-head light of the steamer was seen from the brig when the latter first sighted her. (8) The tracks of the vessels were intersecting, and they were thus nearing each other to the point of intersection; yet, if the steamer had kept her course as the brig did hers, she would have passed under the stern of the brig, and the collision could not have occurred; or if, when the steamer changed her course, she had "slackened her speed," or had "stopped and reversed," the brig would have passed beyond the point of peril before the steamer could strike her. (9) The steamer struck the brig about midnight, just aft the cat-head, causing her to sink almost instantly, and involving the total loss of the vessel and her cargo, of everything on board, and the lives of two persons on board of her. (10) The total damages resulting from the sinking of the brig, as of date July 9, 1878, are $47,828.98, which are claimed respectively by the owners of the cargo, of the vessel, and of the personal property lost on board.

It is a fundamental rule of navigation and the common law of the sea, recognized by statute and enforced by the English and American courts, that if a sail-vessel and a steam-vessel are moving in directions which may involve risk of collison, the latter shall keep out of way of the former. Hence, it is not only the right, but the duty of the sailing vessel to keep her course; and this is always imperative, except under "special circumstances which may exist in every particular case rendering a departure from it necessary in order to avoid immediate danger."

There were no circumstances in this case which required a departure from this rule by the brig. She was not derelict in any respect. She had up, in their proper place and condition, the signal lights required by law. She seasonably and accurately observed the approach and movements of the steamer, warned her of her proximity by the exhibition of a torch-light, and kept her course. Thus she fully performed her duty. Her course was obliquely across the line of movement being pursued by the steamer. The place of the collision was beyond the point at which the paths of the vessels crossed each other, so that the brig had passed the point of possible collision if both vessels had kept their course. This is evident from the acknowledged deflection of the steamer to starboard, and from the direction and effect of her impact upon the brig.

Under these circumstances, then, the presumption of culpability is against the steamer, and the burden rests upon her to repel it. This she has undertaken to do on two grounds: (1) That the star-

board light of the brig was burning dimly, and was so obstructed by her rigging that it could not be seen on the steamer; (2) that the exhibition of the torch-light by the brig was unwarranted, and misled the steamer.

The first hypothesis is, it seems to me, so decidedly against the weight of evidence that I dismiss it with the remark that it is unsustained.

It is earnestly urged that, both by the statutes of the United States and the "law of the sea," the brig was not permitted to show a torchlight. The argument is founded upon the assumption that section 4234 of the Revised Statutes is applicable only to inland navigation. This is an unwarranted limitation of the effect of the section. It enacts that—

" Collectors, or other chief officers of the customs, shall require *all* sail-vessels to be furnished with proper signal lights, and *every such vessel* shall, on the approach of any steam-vessel during the night time, show a lighted torch upon that point or quarter to which such steam-vessel shall be approaching."

This language is not only unambiguous—comprehending *all* sailvessels—but it is imperative, and no sufficient reason is found in the collocation of the section in the original act, of which it was a part, for an arbitrary restriction of the amplitude of its import. But conceding that the brig was not under any legal obligation to show a torch-light, in so doing she did not violate any law, and no fault can be imputed to her for conforming to the laws of her nationality. *The Scotia*, 14 Wall. 185. In that case, Mr. Justice Strong, speaking of our navigation laws, says:

" They are not in terms confined to the regulation of shipping in our waters. They attempt to govern a business that is conducted on every sea. If they do not reach the conduct of mariners in its relations to the ships and people of other nations, they are at least designed for the security of the lives and property of our own people. For that purpose they are as necessary and useful on the ocean as they are upon inland waters. How, then, can our courts ignore them in any case? Why should it ever be held that what is a wrong when done to an American citizen, is right if the injured party be an Englishman?"

In either aspect of the question, then, whether the brig obeyed an imperative requirement of the law of her own country, or merely conformed to a regulation prescribed by such law as useful and necessary for the protection of life and property at sea, she cannot be condemned as in fault. But the steamer was decisively in fault in

omitting to obey the "law of the sea" which required her "when approaching another vessel so as to involve risk of collision, to slacken her speed, or, if necessary, to stop and reverse." She not only did not reduce her speed, but she changed her course, and to each of these causes the collision was attributable. That she was conscious of the risk of collision is demonstrated by the fact that she deemed a change of her course necessary to avoid it, and so effected the change. She observed the torch-light on the brig, and thus was warned of the proximity of another vessel when she was at a sufficient distance to enable the steamer to adopt effective precautions against collision. But she recklessly or inconsiderately maintained her speed, and thus rendered the destruction of the brig inevitable.

For these reasons I am of opinion that the cause was rightly decided by the learned judge of the district court, who exhaustively considered it, and it is therefore ordered that the same decree be entered at length in this court which was rendered in the district court, together with the interest to the date, in favor of the respective libelants and against the respondents and their stipulators, with all the taxable costs in the case.

See *The Golden Grove, ante,* 674.