## Case No. 12,168.

### The RUSSIA.

[3 Ben. 471.] [1]

District Court, S. D. New York. Nov., 1869.

COLLISION — NEW YORK HARBOR — VESSEL AT ANCHOR—INEVITABLE ACCIDENT—HARBOR REGULATIONS — JURISDICTION — SUITS BETWEEN FOREIGNERS.

1. A British steamship, coming into the harbor of New York, was swung by the ebb tide, which forms a rip where the tides from the North and East rivers meet, against an Austrian ship, lying at anchor, and sunk her. The ship had come in from sea the day before, and had anchored where she was sunk, and no notice to remove from that anchorage had been given to her by the harbor masters: *Held*, that

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

the court of admiralty was not called upon, by the fact that all parties concerned were foreigners, to decline, from motives of international comity, to exercise jurisdiction in the case.

[Cited in Bernhard v. Creene, Case No. 1,349; The Belgenland, 114 U. S. 367, 5 Sup. Ct. 866; The Topsy, 44 Fed. 636.]

2. The effect of the tide upon the steamer was not an inevitable accident.

3. The ship being anchored in a customary place, and where no state law or city ordinance forbade anchoring, any general regulation of the harbor masters, forbidding her to anchor there, must be held to have been waived in her behalf, by the failure to give her notice to remove.

[Cited in The John Tucker, Case No. 7,431.]

4. The ship having come in from sea in a seaworthy condition, the fact that she was sunk by the blow of the steamship did not establish that she was not "tight and strong."

[5. Cited in Robinson v. Fifteen Thousand Five Hundred and Sixteen Bags of Sugar, 35 Fed. 603, to the point that, when a libellant agrees to accept a certain sum of money in settlement of his demand, that sum becomes his claim, within the meaning of the statute.]

In admiralty.

C. Donohue and T. Scudder, for libellants.
D. D. Lord, for claimants.

BLATCHFORD, District Judge. This is a libel filed by Ambrozio Ralli, the owner of the Austrian ship Figlia Maggiore, against the British steamship Russia, to recover for the damages caused to the Figlia Maggiore and her cargo, by a collision between her and the Russia, which took place in the harbor of New York, off the Battery, on the 25th of May, 1869, about 11 o'clock, a. m. The Figlia Maggiore arrived in port the day previous, from Marseilles, with a valuable cargo, and came to anchor off the Battery, at a place designated by her pilot, and was at anchor at the same place, at the time of the collision. The Russia was coming in from sea, on a voyage from Liverpool, and was bound to her wharf at Jersey City. The libel alleges, that the Figlia Maggiore was anchored from three hundred to four hundred yards distant from the Battery, and at a place usual and customary for vessels to anchor. The tide was ebb, and the weather was clear. The Figlia Maggiore's stern was tailing down towards the direction from which the Russia was approaching. The stem of the Russia struck the port side of the Figlia Maggiore between the main and mizzen rigging, angling somewhat forward, and crushed her in, so that she sank to the bottom in less than ten minutes, with all the property on board of her. The libellant, as carrier of the cargo on board, having possession of it at the time it was sunk, claims to recover in this suit for the damage to it, as well as for the damage to the vessel and her appurtenances, and for loss of freight, if any.

The defence set up in the answer, to show no fault in the navigation of the Russia, is, that, owing to the crowded state of the mid-

dle and west side of the North river, the Russia was compelled to go over towards the Battery; that, when she was within a sufficient distance of the Figlia Maggiore, her helm was starboarded, so as to cause her to pass on the port side of the Figlia Maggiore, but that, owing to an eddy which the tide made in that place, she did not mind her helm; that her engines were reversed, and her headway had been nearly stopped, when the collision happened; that, at the place where the accident occurred, the tide makes eddies, which are very irregular in their position, direction, and strength; and that it is impossible to foresee when and in what manner they will affect the course of a vessel getting into them. The case is thus sought to be made, on the part of the Russia, one of inevitable accident; and, to attempt to sustain such a view, testimony was put in, on the part of the Russia, as to the action of the tides from the North and East rivers at their junction. Griffiths, a Sandy Hook pilot, testifies, that the ebb tide begins to run out of the East river about an hour and a half before it begins to run out of the North river; that, at about half tide, or about three hours ebb, which was the state of the tide at the time of the collision, it ordinarily runs out of the East river at the rate of about two knots and a half per hour; that, at that time, it runs out of the North river at the rate of about one knot and a half per hour; that, at that time, the two tides meet on a line drawn from the flag-staff at the Battery to Bedlow's Island, the direction of the line being southwest by south; that, as the tide from the East river runs about west-southwest, and that from the North river runs about south, and against it, a regular bulkhead is formed, and a very large ripple is made; that a vessel, on striking it, is generally slewed around by it to the eastward or the westward, dependent upon how she strikes it; that, at the first of the ebb, the line of the tide-rip is up towards Castle Garden; that, as the North river tide comes down, such line is forced down across the mouth of the East river, until, at half tide, it runs about southwest by south, as before stated; that a vessel striking into that tide-rip will not mind her helm until she gets a length into it; and that the pilots generally try to keep out of such tide-rip. On cross-examination, he testifies, that the rip is easily seen, and that it is risky getting into it. This testimony is confirmed by Van Pelt and Bloodgood, witnesses for the claimants, the former a Sandy Hook pilot, and the latter the master of a steam tug. The latter also says, that if a vessel, having slight way on her, runs heading up the North river, across the mouth of the East river, at the stage of ebb tide referred to, her head will turn to the starboard exactly with the tide from the East river. This testimony condemns the Russia, instead of excusing her. In attempting to enter such a tide-rip, with a vessel at anchor,

as the Figlia Maggiore was, on her starboard hand, and near her course, she assumed all the risk of avoiding such vessel. The tide-rip was plainly to be seen, and its course, and character, and action upon a vessel entering it were not fortuitous, or varying, or uncertain, but were, on the evidence, things to be foreseen, and, therefore, to be guarded against. To enter such a tide-rip, was to take, in respect to vessels at anchor ahead, all the risks of so navigating through it as not to collide with such vessels. She entered it at an angle, so that, as the tide from the North river struck her on her port bow, the tide from the East river acted on her starboard side, and the effect was to sheer her head to starboard, although her helm was starboarded, and, with the way she had on, to shoot her, stem on, off to starboard, against the Figlia Maggiore.

There is nothing to show that the Figlia Maggiore was anchored in an improper place. On the evidence, she was anchored in a customary place of anchorage, and in a place not forbidden by any state law or city ordinance. As to any general regulation made by the harbor masters, it is not shown that those charged with the anchorage or management of the Figlia Maggiore were notified of any such regulation, or had been warned not to allow their vessel to remain where she was. As she had taken her anchorage in a place not shown to have been in itself unsafe or improper, as respected the navigation of other vessels, a failure on the part of the proper harbor master to notify her to remove from such anchorage must be regarded as a waiver, in her favor, of at least any general regulation, of which she was not, in fact, notified, which forbade her anchoring at the place where she was anchored.

Of the various other defences set up in the answer, none are made out. Those on board of the Figlia Maggiore did not neglect to take any measures which it is shown they could have taken to prevent or avoid the collision or its consequences. The allegation, in the answer, that the Figlia Maggiore would not have received the damage actually sustained, if she had been tight and strong, is not true in the sense stated, nor is it any defence in that sense. She had just come in, in fair seaworthy condition, from a long voyage; and she was entitled, in law, to have the navigation of the Russia, in respect to her, regulated by some other standard than her capacity to successfully resist, at anchor, a blow from the Russia in motion. Amoskeag Manuf'g Co. v. The John Adams [Case No. 338].

The service on the claimants of the attachment issued against the libellant by the state court after this suit was brought, can in no manner affect this suit in rem against the Russia.

One more point, raised in the answer, remains to be noticed. It is, that, as both of

the vessels are foreign vessels, not owned by citizens of the United States, this court ought not to entertain jurisdiction of the cause of action set forth in the libel. It is not maintained that this court is without jurisdiction of this suit, but it is urged that it ought not to busy itself with deciding a controversy between foreign vessels and foreigners. This case being one of a collision on navigable waters in the harbor of New York, is a civil case of admiralty and maritime jurisdiction; and, therefore, within the cognizance of this court, by virtue of the 9th section of the judiciary act of September 24th, 1789 (1 Stat. 77), the Russia having been attached within the territorial jurisdiction of this court. The Propeller Commerce, 1 Black [66 U. S.] 574; The Belfast, 7 Wall. [74 U. S.] 624, 637–642. The ground urged why this court should not exercise jurisdiction in this case is, that, although it may have power to hear and determine this suit, it will regard the circumstances of the case as rendering it unfit that it should hear and determine it, because the libellant and the claimants are not citizens of the United States and the colliding vessels are both of them foreign vessels. It is supposed that the court ought, from motives of international comity, delicacy and convenience, to decline the suit, and it is maintained that justice does not require this court to interpose in favor of the foreign libellants. Although, on these principles, the court of admiralty forbears, as a general usage, to exercise its jurisdiction over controversies between foreign seamen and ship masters (The Napoleon [Case No. 10,015]), and over suits brought by foreign seamen against masters or owners, being also foreigners, or against foreign vessels (Davis v. Leslie [Id. 3,639]; Bucker v. Klorgeter [Id. 2,083]), yet the principle upon which such court proceeds in determining, in any case, whether to exercise such jurisdiction or not, is to inquire whether the rights of the parties will best be promoted by retaining and disposing of the case or by remitting it to a foreign tribunal (One Hundred and Ninety-Four Shawls [Id. 10,521]). I am not aware that jurisdiction, in a case of collision, has ever been declined by any court of admiralty, either in the United States or in Great Britain, because the two colliding vessels were the property of foreign subjects. In the case of The Johann Friederich, 1 W. Rob. Adm. 35, 37, which was a case in rem prosecuted in the high court of admiralty in England, on a collision on the high seas, between Dover and Dungeness, between a Danish vessel and a Bremen vessel, whereby the Danish vessel, with a cargo on board belonging to British subjects, was sunk and totally lost, Dr. Lushington said: "It has also been said, in the course of the argument, that this court is not desirous of exercising its jurisdiction between foreigners; and, in support of this doctrine, some observations of Lord Stowell, in cases of seamen's wages, have been cited. But it appears to me that the cases cited are distinguishable from the present for the following reason—that all questions of collision are questions communis juris, but, in cases of mariners' wages, whoever engages voluntarily to serve on board a foreign ship, necessarily undertakes to be bound by the law of the country to which such ship belongs, and the legality of the claim must be tried by such law. One of the most important distinctions, therefore, respecting cases where both parties are foreigners, is, whether the case be communis juris or not." Again, he said (page 38): "If these parties must wait until the vessel that has done the injury returned to its own country, their remedy might be altogether lost, for she might never return at all; and, if she did return, there is no part of the world so distant to which they might not be sent for their redress. * * * From these considerations it is perfectly clear, that a refusal to exercise the jurisdiction of the court in these cases would, in effect, amount to a total denial of justice." In conclusion, the judge stated the following to be the grounds on which he exercised jurisdiction in the case: "1st. That all causes of collision are causes communis juris; 2dly. That the vessel, at the time of her arrest, was within admiralty jurisdiction; 3dly. That the collision took place upon the high seas close upon the English coast." He added: "If it had been necessary, I could have cited several authorities in support of the general jurisdiction of the court. But I decide the question on the grounds I have stated, without taking into my consideration the circumstance that was adverted to in argument, that the cargo on board was the property of British subjects. This fact is undoubtedly of considerable importance, inasmuch as I am at a loss to conceive how I could refuse jurisdiction, and send the British owners to a foreign country; and, what an anomaly would occur, if, in a transitory action, I could do justice to one set of owners, and refuse it to another." In the case of The Griefswald, 1 Swab. 430, 435, Dr. Lushington says: "In cases of collision, it has been the practice of this country, and, so far as I know, of the European states and of the United States of America, to allow a party alleging grievance by a collision, to proceed in rem against the ship wherever found."

In the present case, no reasons exist why this court should decline jurisdiction. The case is one of collision. The Russia has been arrested within the jurisdiction of this court. The collision took place in the harbor of New York. Several of the witnesses on both sides belong in New York, and were not on board of either vessel. There is no special question arising under the local laws either of Great Britain or of Austria to be be determined in this case. These consid-

erations, independently of the fact stated on the trial, that some of the cargo of the Figlia Maggiore belonged to citizens of the United States—a fact which is, however, not averred in the libel or shown by proof—induce the court to regard this case as one in which it is eminently proper and conducive to justice that it should exercise the jurisdiction invoked by the libellant.

There must, therefore, be a decree for the libellant, with costs. The reference to ascertain the damages will include damage to the cargo as well as to the vessel, the former being claimed in the libel to be recovered by the libellant, as carrier in possession at the time the damage was done. The Commerce, 1 Black [66 U. S.] 574, 582; The Commander in Chief, 1 Wall. [68 U. S.] 50–52.

[For a hearing on exceptions to the commissioner's report, see Case No. 12,169.]