THE HOMER.

(District Court, D. Washington, N. D. February 3, 1900.)

1. COLLISION—DEFENSE OF INEVITABLE ACCIDENT.

To exonerate a steamer from liability for an injury resulting from a collision with a vessel moored at a wharf on the ground of inevitable accident arising from a latent defect in her machinery, it must be shown that such defect could not have been discovered by a person of competent skill in the exercise of ordinary care, and, further, that such defect necessarily caused the accident.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and held to establish that the collision of a steamship with a vessel moored to a wharf was due to the fault of the master of the steamship.

3. SAME—SUIT FOR PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE.

Libelant was at work on a vessel moored to a wharf, when she was struck by a steamship. The steamer sounded no warning, and libelant did not know of her approach until immediately before the collision, and, when called to, he turned to pick up his coat, which contained a check,

before starting to leave the vessel, and before he could reach the wharf the vessel was struck, and he was seriously injured. *Held*, that the fact of his momentary delay to rescue his coat was not a defense to an action against the offending vessel to recover for his injuries.

4. DAMAGES—PERSONAL INJURY—AMOUNT OF AWARD.

An award of $12,000 made to a libelant who was a young man with an expectancy of more than 30 years, for an injury to his back in a collision, by which his lower limbs were paralyzed, he was caused great suffering, and would probably, as shown by the evidence, remain a helpless cripple through the remainder of his life.

Suit in rem to recover damages for a personal injury caused by the steam schooner Homer running into the brigantine Blakely while the libelant was working as a carpenter on the latter vessel, which was at the time moored to a dock in Seattle Harbor. Hearing on the merits. Decree for libelant.

Martin, Joslin & Griffin, for libelant.

Metcalfe & Jurey, for claimant.

HANFORD, District Judge. From the evidence in this case I find that the particulars of the mishap from which this suit arises are as follows: At about 7:45 a. m., April 26, 1899, the steam schooner Homer was making her way from the Moran Company's shipyard to the Schwabacher dock, in the harbor of Seattle, which dock extends from the eastern shore westwardly into the bay. It was the intention of her captain to lay the Homer across the outward end of the dock, where she was to take on board some spars or other timber. The distance from the shipyard to the Schwabacher dock is, approximately, one mile. The morning was clear. There was a stiff breeze from the south, and the tide was slack. The Homer has two engines and twin propellers. She had been inspected by the United States inspectors of steam vessels less than one week before the accident, and all changes in her equipment which they required had been made, and her signal bells and attachments had been tested by her captain and engineer only a few minutes before she started, and were found to be in apparent good working condition. In making the run to the dock, only the port engine was in operation, under a slow bell. The testimony does not show what pressure of steam was raised, but her speed was about four miles per hour, and her course was north, or nearly so. The brigantine Blakely was at the time moored on the south side of the Schwabacher dock, her bow pointing towards the shore, and her stern being far enough in towards the shore to be well out of the way of vessels coming to the end of the dock. On the north side of the dock a British vessel, named the Hatton Hall, was moored, with her bowsprit projecting out beyond the outer end of the dock. The libelant was working as a ship carpenter on board the Blakely, and immediately before the Homer struck her he was on deck on the starboard side of the main hatch, facing towards the dock and towards his work, which required him to stoop or bend his body, and he had no warning or intimation of the Homer's approach until the instant of the collision. During the time of the maneuvers of the Homer her captain's position was on her upper

deck, abaft the pilot house, and about 7½ feet distant from a ventilating funnel, through which he was able to communicate with the engine room. He was in reach of the handles connected with wires and attachments for sounding the gong in the engine room, which was the ordinary means for directing the engineer. In that position he could see ahead, watch the wheel in the pilot house, and hear distinctly the gong when it was sounded in the engine room. When the Homer had approached to a point which the captain estimated to be 50 feet to the east and 200 feet south of the end and south side of the Schwabacher dock, the captain pulled one of the handles, intending to sound the gong once as a signal to the engineer to stop the port engine. At that moment he for the first time noticed the bowsprit of the Hatton Hall projecting beyond the end of the dock, and the discovery seems to have diverted his attention, so that he probably did not notice that the gong did not sound in response to his pull. He then, quickly as the motion could be made, pulled the same handle twice, intending to sound the gong twice as a signal to the engineer to reverse the port engine, and, although he noticed in his own mind that the gong did not sound, he at once pulled the other handle twice as a signal to the engineer to start the starboard engine backward, and to that movement the gong responded; and the engineer obeyed the order, but, as the engineer had not received any direction to stop or reverse the port engine, it continued working ahead. The effect of the port engine going ahead with the starboard engine backing was to swing the bow of the vessel to starboard. As soon as the captain noticed the apparent confusion, he stepped to the ventilator and called to the engineer to back, and he heard his order repeated in the engine room, but he then noticed that the steamer had swung in so far that she could not clear the end of the dock, and, being in that situation, he ordered the man at the wheel in the pilot house to set his wheel hard a-port, which order was instantly obeyed; and, so far as the testimony shows, this was the only order given by the captain to the man at the wheel, and this was the only movement of the vessel's helm. As quickly as he could speak after giving the order hard a-port, the captain called to the engineer through the ventilator, "Back her like hell," and repeated the same cry one or more times, to which the response was given, "She is backing, sir;" and it was not until that order was given that the port engine was reversed. About the same instant, or within a few seconds afterwards, the Homer came upon the Blakely without having given a blast of her whistle, or any warning sound. She was swinging to starboard under the influence of her helm and the peculiar working of her propellers, so that she struck in a glancing and raking manner, and immediately afterwards commenced to back off. The testimony does not go into all the details of the injury done to the Blakely, but it does show that her forerigging was torn away, a yardarm and its braces were broken, and a 12-inch block suspended from the arm fell to the Blakely's deck. The position of the libelant at his work was such that he did not see the approach of the Homer until another person near him gave a warning cry just as

the Homer was about to strike. Several persons were near by, and they all made a rush to get over on the dock. The libelant started also, as quickly as a man taken by surprise might be expected to, and, as he started, he grabbed his coat, in the pocket of which he had a check for $234. His testimony shows that he thought of the check, and his movement to save it may have delayed him one or two seconds in getting away. He did not succeed in his effort to get on the dock, and he was found, immediately after the collision, on the Blakely's deck, badly injured, and suffering extreme agony from an injury to his back. The 12-inch block which had been attached as a pendant to the broken yardarm was found lying on the deck near the libelant. There were no indentations or marks on the deck to indicate that it had struck there with any great force, and the libelant's back was bruised in a manner to indicate that he had received the force of the falling block. Ever since the occurrence, the libelant has been in a helpless and pitiable condition, and a great sufferer. He has no use of his lower limbs, and it is reasonably certain that he will remain a helpless cripple during the balance of his life, although the physicians who have attended him admit that they cannot say that it is impossible for him to recover.

The suit is defended on three grounds, which are as follows: (1) Inevitable accident. In this the claimant contends that the conduct of the Homer in going out of her course and colliding with another vessel which was stationary, and moored to a dock, was purely accidental, and could not have been prevented by the exercise of ordinary prudence and the care and skill on the part of her captain and crew which the circumstances required. (2) The claimant contends that the evidence is insufficient to show clearly that the injury to the libelant was caused by the collision. In this he relies upon the admissions of the libelant, and all the witnesses who have testified in his behalf, to the effect that none of them did actually see the block strike the libelant, and the testimony of the man who was at the wheel in the pilot house of the Homer, to the effect that the block did not fall to the deck of the Blakely, but first struck on top of the galley of the Homer, and then, as she backed away from the Blakely, it was drawn overboard, and afterwards hung over the starboard rail of the Blakely. (3) The claimant sets up as a complete defense that the libelant is wholly responsible for his own injury by reason of his deliberate and reckless disregard of his duty to get out of the way immediately, and it is contended that there was deliberate and reckless disregard of his own safety on the part of the libelant shown by his effort to save his coat and bank check. All of these contentions are, in my opinion, destitute of any merit whatever. Nevertheless, as able counsel have been led by zeal in the cause of their client to make these defenses earnestly and in good faith, I have given each of them serious attention, and will endeavor to give reasons for deciding adversely.

It is insisted that the Homer was swung from her proper course, and that her speed could not be checked in time to prevent the collision, by an accident, which accident was "inevitable," because a soft metal tube, called a "pintle," set in the upper deck, through

which the wire for sounding the gong in the engine room passes, had become bent, so as to prevent proper action of the wire when the captain pulled the handle, and that this was a latent defect in the equipment of the vessel,—that is to say, it had not been discovered by the captain,—and in consequence of this latent defect the gong did not sound when the captain attempted to give three bells to stop and reverse the port engine, and, in consequence of the gong not sounding, the engineer did not stop or reverse the port engine, and in consequence of this failure the port engine continued to drive ahead after the starboard engine had been started backing, and had the effect to swing the bow of the vessel to starboard, and to prevent her momentum from being checked in time to avoid the collision. This all rests upon the erroneous theory that any defect in the machinery or equipment of a vessel is a latent defect, and that the law will regard any mishap it causes as an inevitable accident, for which no liability for resulting injuries will attach to the ship or her master, if, upon a careful inspection within a reasonable time preceding the accident, by competent persons, the defect was not discovered, and was unknown. The law, however, does not excuse the use of defective machinery and appliances merely because the users fail to discover their defects. The question to be determined before condemning or excusing the responsible party is not whether the defects were discovered or known, but these: Could the defects have been discovered by a person of competent skill and judgment if he acted with a degree of care and vigilance amounting to ordinary care and prudence in view of all the circumstances? And, if the defect was undiscoverable by the exercise of ordinary care and prudence, did it necessarily cause the accident? In this case the bent pintle is a matter of trifling importance. The fact that the bell wire was not in working order could have been discovered by a competent person if he was alert and attended to his duty at the moment of an attempt to use the bell, for the action or nonaction of the wire in his grasp would indicate that it was not serving its purpose, and the same thing would be indicated instantly by the failure of the gong to respond, and the failure of the engineer to act. Furthermore, the bent pintle was not the sole cause nor the proximate cause of the accident. When the intended signals to stop and reverse the port engine failed, the vessel would have passed clear of the dock, and no harm would have been done, if she had continued on her course. There was no necessity for haste to back the starboard engine, and it was the captain's duty to control the movements of the vessel so as to keep her from striking the dock or the other vessels moored there. If the captain had not ordered the engineer to start the starboard engine backward before the port engine had been stopped and reversed, and if he had required the man at the wheel to use the helm so as to keep the vessel from swinging to starboard, she would not have gone out of her course, and the accident would not have happened. Here I find the captain in fault in two particulars: First, in signaling the engineer to back the starboard engine without first actually knowing that his intended orders to back and re-

verse the port engine had been executed by the engineer; second, in not giving attention to the helm, which is the means provided for controlling the course of a ship under way; and neither one of these errors can be excused by reason of an unknown injury to the pintle.

Referring to the second ground of defense, there is certainly more than a mere preponderance of the evidence supporting the libelant's contention that the block struck him in the back when it fell after being torn from its attachment to the broken yard-arm. The injury to the libelant is just such an injury as would be caused by a person struck in the back by such a missile. There is not a particle of evidence supporting the contention on the part of the claimant that a different timber or heavy object might have been displaced by some cause other than the collision, and that the injury might have been inflicted thereby. The block was found at the place where it would naturally lodge on the deck of the Blakely, immediately after the injury. This is fully proved by the testimony of several witnesses, and the court would not be justified in rejecting the testimony of a number of unimpeached, disinterested witnesses because the man at the wheel on the Homer has given testimony to the effect that he saw the block fall on the galley of the Homer, and go overboard, and that he afterwards saw it hanging over the side of the Blakely. I believe that his testimony refers to a different block, or else he is mistaken in supposing that he saw any block.

The third defense has nothing to rest upon except the fact that the libelant was not so nimble in getting out of the way, when surprised by imminent danger, as the other persons who were near him at the time. In the argument made by counsel for the claimant, the libelant was severely criticised for the concern which he manifested to rescue the bank check representing over $200, which was in his coat. But the law does not grant immunity to those responsible for the negligent use of a dangerous power by which others are injured merely because the injured party has failed to save himself by the extreme swiftness or extraordinary skill of his own movements; nor will the law deny its protection to a man whose mind at the moment of extreme peril involuntarily becomes fixed upon his most valuable accumulations, and prompts him to try to save something which may be of the utmost importance to himself and family in case of failure to save himself from severe bodily injury, or regard the injured party as being in fault for a mere error committed in extremis. The libelant is a young man. At the time of the injury he had an expectancy of more than 30 years yet to live according to the tables of mortality based on the average duration of human life. For his loss of earning capacity, his expenses consequent upon his injury, his suffering, and the misery of having to live as a helpless cripple, he is justly entitled to recover substantial damages. I award him $12,000, and costs.