THE HOMER.

(Circuit Court of Appeals, Ninth Circuit. May 13, 1901.)

No. 598.

1. COLLISION—DEFENSE OF INEVITABLE ACCIDENT—EVIDENCE CONSIDERED.

A collision between a steamship and a vessel moored to a wharf was due to the fault of the master of the steamship, and not to inevitable accident, because of a latent defect in the apparatus by which signals were communicated from the master to the engineer, where, although such defect existed, it was of such a character that the master, in the exercise of proper care, should have discovered it at once on attempting to ring the engineer's bell, and should have known that his attempted signal was not given, but, assuming it to have been received by the engineer, he gave further orders, which directly brought about the collision.

2. DAMAGES—PERSONAL INJURY—REDUCTION OF AMOUNT ON APPEAL.

An award of $12,000 damages, made by a court of admiralty for a personal injury received in a collision, reduced to $6,000 on new evidence taken in the appellate court, showing that the improvement in the condition of libelant since the trial was such as to indicate that the injury was not so serious or permanent as it appeared at the time of the trial.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

For opinion below, see 99 Fed. 795.

Metcalfe & Jurey and Andros & Frank, for appellants.
Martin, Joslyn & Griffin and William Martin, for appellee.
Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The appellee, while engaged as a ship carpenter in work upon the deck of the brigantine Blakely as she lay moored to the south side of Schwabacher's wharf, in Seattle, received serious injuries from the collision of the steamship Homer with the Blakely. The Homer was a twin-screw steam schooner driven by two separate engines, and just prior to the collision was being taken northward along the water front of Seattle, going at the rate of four or five miles an hour, with her port engine going under slow bells, and her starboard engine stationary. The weather was clear, and there was no obstruction to prevent the master of the steamship from seeing the Blakely as she lay moored with her port side against the wharf, and her stern about 200 feet from the end thereof. The steamship was, in effect, equipped with two bridges,—one in front of the pilot house, and one abaft the pilot house. The system of communication between the master on the bridge and the engineer in the engine room was by means of a bell near each engine, with separate wires attached to each, and running up to the bridges, with bell pulls upon each bridge. Speaking tubes connected each engine with the bridge in front of the pilot house. When the steamship approached the end of Schwabacher's wharf, at which she was to make a landing, the master gave bell signals to back both engines at full speed, so as to stop his ship, and obtain control of her before reaching the wharf. He pulled the bell of the port engine once to stop, and immediately gave two bells to reverse the screw, and immediately thereafter pulled the starboard bell to back the starboard engine. The signals for the port engine were not received by the engineer. He heard the signal for the starboard engine, and immediately obeyed it. The port engine was then going forward under slow bells, and the starboard engine was backing at full speed. The result was to swing the vessel to starboard, and in the direction of the Blakely. The master of the Homer, finding that the steamship was proceeding off her course, and realizing that something was wrong with his signals, immediately stepped back, and shouted down the ventilator, which was a few feet abaft the pilot house, and told the engineer to back her. The engineer then stopped the port engine, and backed with both engines. At the same time seeing that a collision was inevitable, the master ordered the vessel hard a-port, hoping thereby to swing the steamship still further to starboard, and thereby lessen the force of the collision, and he turned around, and again shouted down the ventilator, "Back her like hell," to which the engineer made response, "She is backing, sir." The steamship was then right upon the Blakely. It appeared in the evidence that a few days prior to the accident, by direction of the United States inspectors at Seattle, the bells on the steamship had been extended back of the bridge abaft the pilot house, that the master might stand there in a more advantageous position in navigating his ship. The bell cord which

ran from the pilot house to the port engine, and which was used by the master on this occasion, was found, after the collision, to be out of order. Immediately above the deck, where the wire passes down from the pilot house through the deck, it passed through a brass cylinder or pintle, which stood about six inches above the deck, placed there to prevent water leaking through the hole in the deck. Over this pintle, and fitting upon the same, passed a brass cover, which was attached to the wire, and rose and fell with the wire as signals were given. It was found, after the accident, that the upper portion of the cover had caught upon or near the top of the pintle, preventing the recoil of the wire, and preventing the sounding of the bell in answer to the bell pull. It is not known whether the cover was so caught in giving each of the three signals to the port engine, but, in view of all the circumstances, it seems very probable that such was the case. The engineer heard none of the signals for the port engine, and the master himself, standing where the sound of the port engine bell was distinctly audible to him if it had rung, testifies that he did not hear the first bell; that his attention was directed to the bowsprit of a vessel which extended beyond the end of the wharf on the north side thereof; and that he was not sure that he heard either of the other two bells, but he thought he heard one.

The appellants contend that the collision was wholly attributable to the disordered condition of the port engine bell cord, and that it was an inevitable accident,—one that could not have been guarded against,—and that, therefore, the steamship is not responsible for the injury which the appellee suffered. The district court found adversely to this contention. Upon the evidence in the case we discover nothing to warrant us in disturbing that finding. The steamship, proceeding along the water front with a single engine, under slow bells, on a clear day, ran into the brigantine, which was lying in plain sight at her wharf. The presumption of the law is that such a collision must have resulted from the negligence of the moving steamer. The testimony furnished by the appellants is not sufficient to rebut that presumption. Negligence may well be attributed to the action of the master in proceeding to order the starboard engine to back under full speed without having first heard any of the bells of his signals to stop and back the port engine. Not only was the absence of sound from the port engine bell sufficient to put him upon his guard against ordering the reversal of the starboard engine, but the condition of the bell wire itself, when the cover was caught upon the top of the pintle, should have advised him that something was wrong with his signal wire. He testified that he had properly and practically tested the bells that morning before the vessel started out, and only half an hour before the time of the collision, and they worked properly, and responded promptly. In making such test he must have become familiar with their operation, and with the extent and nature of the recoil of the bell handle when the wire was working properly. According to the construction of the wire as it was shown in evidence, the bell handle must have risen, in answer to his pull, a distance of nearly six inches.

Its failure to recoil when released should have been instantly detected. It was sufficient to warn the master that his signal had not been carried to the engine room. The operation of the wire might have been obstructed from one of various causes. Until the master knew that his signal to stop and reverse the port engine had been received in the engine room, due care required him to give no order to back the starboard engine. He was safe to go on as he was. Under the operation of the port engine, with the aid of the helm, he could have gone past the wharf, and avoided all obstructions, until he had time to discover what was the trouble with the wire, or otherwise communicate his orders to the engineer. His conduct in proceeding as he did was not the less negligent from the fact, so earnestly relied upon by the appellants, that the signals to stop and back the port engine and to back the starboard engine were given as one signal, at one time, and for one purpose, which was to stop the forward motion of the vessel. Conceding all that may be urged from this fact, it remains true that the master gave signals, some of which he had reason to believe had not reached the engineer, and that he permitted his vessel to proceed without knowing that it was safe for her to proceed. There was abundant time, after he had given his signals, to have called the proper orders to the engineer through the speaking tube or through the ventilator. The proximate cause of the collision was clearly not the latent defect in the signal wire, but was the negligence of the master of the colliding steamship.

Nor do we find, as it is contended by the appellants, that the evidence fails to sustain the finding that the collision was the proximate cause of the appellee's injuries. It is said that the appellee had warning in time to have escaped from danger, and that he would not have been injured but for the fact that he turned back to get his coat, inspired to do so by the fact that there was a check for $234 in it. The district court, upon consideration of all the evidence, found that the appellee was not negligent in this respect. His own evidence was that he was stooping over the main hatch, at work upon the construction of a booby hatch, when he was warned of danger, and, looking up, saw the steamship just striking, or about to strike. and saw and heard her master shouting down the ventilator; that he stooped and picked up his coat, and ran. There is evidence of other witnesses who corroborate this testimony, and show that the time consumed in getting the appellee's coat was very short.—probably not more than a second,—and that the appellee acted with the greatest diligence in endeavoring to escape and protect himself.

It is further contended that there is no evidence to support the finding that the appellee was injured in the manner set forth in his libel. In his libel and in his testimony he attributes his injury to a blow upon the back from a falling block. It was clearly proven that the end of the fore yardarm of the Blakely was broken off at the point where was fastened the pennant, a large wire rope 15 feet long. with a large block attached to the lower end thereof. through which ropes ran aft, and were fastened to the starboard

side of the vessel; and that the pennant and block were hurled with great force down across the vessel from the starboard to the port side. It was proven beyond a question that the appellee received a heavy blow from some falling object, and that the block was found upon the deck near the point where he was when he was struck. It is immaterial that no witness saw the block strike the appellee. There is a moral certainty, from all the circumstances, that it was the block that struck him. If it was not the block, the conclusion is irresistible that he was struck by something else that fell as the result of the collision, and that the collision was the proximate cause of his injury.

The district court awarded the appellee damages in the sum of $12,000. It is earnestly insisted that this is excessive. The accident occurred on April 26, 1899, and the taking of the testimony which was submitted to the district court was closed in the latter part of the following November. Upon that testimony, we think, there can be no question that the award of damages was justified. The evidence indicated that the blow which the appellee received was an extremely severe one, and that it caused great pain and suffering, and permanent disability. After the appeal had been taken, the appellants, at the May term of 1900, made an application to this court, based upon affidavits tending to show that the appellee had in a large measure, if not entirely, recovered from his injuries, and that he had been seen at work. Upon these affidavits an order was made directing that further testimony be taken concerning the condition of the appellee and the extent of his injuries. Numerous witnesses were sworn, and a large amount of evidence was taken, which is now before us. We have carefully examined it all. Upon the side of the appellants there is evidence tending to show that the appellee, in March, 1900, worked several days, by the day, with a gang of laborers employed in shoveling sand and running a wheelbarrow in working upon a grade, and that in April following he was seen painting a boat. Opposed to this is the evidence of the appellee, his wife, neighbors, and others to the effect that the testimony so offered by the appellants is wholly untrue, and that the appellee, although he has partially recovered, so as to be able to walk with the aid of a cane, has never been able to do any work since the date of his injury, and that probably he will never recover so as to work at his trade. Upon a careful consideration of the whole of the evidence, it would appear that the preponderance is clearly against the truth of the testimony that in March, 1900, the appellee worked with a shovel and wheelbarrow in constructing a grade; but, a doubt concerning the permanency of his injuries having been created by the evidence, the court directed that further testimony of physicians be taken, which was done. Upon the evidence so taken and submitted, the majority of the court is of the opinion that the appellee has not suffered such permanent injury as was indicated by the evidence upon the trial of the case in the district court, and has reached the conclusion that the award of damages should be reduced to $6,000. With that modification, the decree will be affirmed.