POUPPIRT v. ELDER DEMPSTER SHIPPING, Limited.

(District Court, E. D. Virginia. March 28, 1903.)

1. ADMIRALTY JURISDICTION — TORTS COMMITTED ON HIGH SEAS — FOREIGN SHIPS.

A court of admiralty of the United States has jurisdiction of an action in personam against the owner of a foreign ship to recover for injuries sustained by an American passenger on the high seas, irrespective of the law of the ship's flag.

2. SHIPPING—ACTION FOR INJURY TO PASSENGER—LIABILITY OF SHIPOWNERS.

An action in an admiralty court of the United States to recover for injuries sustained by an American passenger on a foreign ship on the high seas is governed by the general maritime law as administered in this country; which gives a remedy against the ship's owners where the injury was due to the negligence of those in charge of her navigation.

3. SAME.

The highest degree of care for the safety of a passenger is required of a ship, and where injury is sustained by the passenger the presumption of negligence is against the carrier.

4. SAME—EVIDENCE CONSIDERED.

Evidence examined, and held to sustain the allegations of a libelant that while a passenger on respondent's ship he was injured, without negligence on his part, by being struck by a long timber which was thrown over the side of the vessel by the crew, under command of an officer, without having been given any warning of the danger.

5. DAMAGES—PERSONAL INJURY.

An award of $12,000, made to a libelant, who was a successful veterinary surgeon, 28 years old, with a practice worth $3,000 per year, for an injury received while a passenger on respondent's vessel, by which his skull was crushed, necessitating a surgical operation for which he was charged $2,000, confining him to his bed for several months, and

leaving him permanently paralyzed and incapacitated for the work of his profession, and with an open wound in his head, was not excessive.

In Admiralty.

Libel in personam to recover damages against the respondent corporation, owners of the British steamship Montenegro, for personal injuries received by libelant, a passenger on said steamer, and in which action a foreign attachment was issued, and levied upon respondent's ship.

The facts in the case are briefly these: The steamship Montenegro was, in the fall of 1901, under charter by the British government to carry a cargo of mules from the port of New Orleans to the ports of Cape Town or Durban, South Africa. The libelant was a veterinary surgeon, of Leavenworth, Kan., employed by the British government to accompany the steamship en route, to care for the mules. The terms of the contract provided for the transportation and subsistence of the doctor on the voyage out and back to the port of New Orleans. The cargo was delivered at Durban, and on the 7th of October, 1901, the return trip to the port of New Orleans was begun, the libelant and another veterinary surgeon, Dr. Miller, and a Mr. Matthews, who has since died, being the only passengers; and there were on board, in addition to these three and the crew, some fifty odd employés, muleteers, and the foreman and subforeman, who had gone over to attend the mules, and were being returned to this country, as was required by the British government. Upon reaching Port Eads, near the mouth of the Mississippi, on the 10th of November, the steamship was directed by its owners to discontinue its voyage to New Orleans, and proceed to the port of Galveston, Tex., there to load with cotton, which the ship did, and en route the ship's officers proceeded to remove the cattle fixtures, necessary to the carrying of a cargo of that character, from the hold and deck of the ship. On the evening of November 12th or 13th, the exact date not being entirely clear, about 4:30 p. m., and while engaged in casting overboard a piece of timber, one of the temporary beams covering the main deck, that reached entirely across the ship, libelant was struck, as the same was thrown into the water, from which blow he sustained the injuries complained of. Libelant insists that his injury was solely due to the negligence and lack of care on the part of the navigators of the ship in removing the cattle fixtures, and attempting to throw over a piece of timber of the size and description of the one by which he was struck, while the ship was proceeding at full speed, from 9½ to 10 knots an hour, and also because of their not properly warning passengers, and himself especially, of the danger of occupying the main deck pending such work. He insists, moreover, that he was, by reason of the ship's change of its place of destination, carried, against his protests, from Port Eads to Galveston, instead of being landed at New Orleans, as he should have been. On the other hand, respondent insists that the accident was due entirely to libelant's want of care, at the time of the accident, in going upon the main deck; that he was duly warned of the dangers thereof at or about the time of the injury to him; and that he was carried to the port of Galveston by his own consent. Respondent also insists that the libel cannot be maintained, for an injury aboard of a British ship is subject to the laws of Great Britain, and under those laws courts of admiralty do not take cognizance of such actions, and that, therefore, this court should not take jurisdiction, as it only administers the British law.

Whitehurst & Hughes, G. L. McCracken, and James B. & Charles J. Stubbs, for libelant.

Hughes & Little, for respondent.

WADDILL, District Judge (after stating the facts as above). The vice in the legal position thus taken by proctors for respondent is patent, and grows out of their treating this case, where the tort sued for was committed upon the high seas, as if committed upon a British ship, exclusively within the British jurisdiction, and between British subjects. The position is possibly a correct one in cases of torts so

committed. But it has no application to a case like this, brought to recover for injuries sustained by an American passenger on board of a foreign ship on the high seas. The fallacy of respondent's position is fully shown in The Chartered Mercantile Bank of India, etc., v. The Netherlands India Steam Navigation Company, Limited, 10 Q. B. 521, 536, 537, 544, 545. This was an action brought by the owner of certain goods, shipped under a bill of lading in the defendant's vessel, called the Crown Prince, and lost in a collision on the high seas, between that vessel and the Atjeh, another vessel of the defendants. Brett, L. J., speaking for the court in that case, said:

"Therefore it seems to me on the question of fixing the defendants with liability for the negligence of the captain and crew of the Atjeh, who are admitted to be the servants of the defendants, that the defendants cannot escape liability by saying their ship was not registered as a British ship, but that she was registered as a Dutch ship. She was, nevertheless, an English ship, and the defendants are liable according to English law. But I will assume that both ships are Dutch ships. Nevertheless, whatever might have been the Dutch law, if this case had been tried in Holland, it seems to me the defendants are still liable. The negligence on the part of the servants of the defendants did not take place in Holland; it did not take place within the sole territorial jurisdiction of a foreign country. This case is not like The M. Maxham, 1 P. D. 107, where the ship in Spain ran against a pier or quay in Spain. In that case, whatever the cause of action was, it arose entirely in Spain, and the action was an action in tort, and the well-known rule applies that for any tort committed in a foreign country within its own exclusive jurisdiction an action of tort cannot be maintained in this country unless the cause of action would be a cause of action in that country, and also would be a cause of action in this country. Both must combine if the tort alleged was committed within the exclusive jurisdiction of a foreign country. But the negligence complained of in this action took place upon the high seas, which is the common ground of all countries. Therefore that rule with regard to the exclusive jurisdiction of a foreign country does not apply. The case comes to this, whether an action for a tort committed on the high seas between two foreign ships (for I assume for this purpose that both are foreign ships) an action can be maintained in this country, although it is not a tort according to the laws of the courts in that foreign country. From time immemorial, as far as I know, such actions have been maintained in the court of admiralty, and the rule of the liability of the shipowner for the acts of his servants has been invariably employed, and, inasmuch as the rule of exclusive jurisdiction cannot apply, it seems to me that if a foreigner in this country can be served with a writ for an act of his servants done on the high seas, which are as much within the jurisdiction of England as they are within the jurisdiction of any other country, an action can be maintained in a court of common law."

In the same case, Lindley, L. J., speaking on the same subject, said:

"What reason is there for saying that Dutch law, as distinguished from English law, or the general maritime law, is to govern such a case? The reason alleged is that, each ship being Dutch, the law of the flag, i. e., the Dutch law, regulates the persons on board each ship, and determines the rights and liabilities of her owners both towards the captains and crews and towards the owners of the cargoes on board. This reason is based on a very common and fruitful source of error, viz., the error of identifying the ships with portions of the territory of the states to which they belong. The analogy is imperfect, and is more often misleading than the reverse, as I have endeavored to point out before. Reg. v. Keyn, 2 Ex. D. 93–94. In this particular case the analogy appears to me more misleading than usual. I am not aware of any decision in this country to the effect that where two ships come into collision on the high seas the rights and liabilities of their respective owners have been held to depend on the laws of the respective

flags of the ships. The law applicable in this country to cases of collision on the high seas is the maritime law as administered in England, and not the laws of the flags. See The Johann Friederich, 1 Wm. Rob. 35; The Leon, 6 P. D. 148; and Foote on Priv. International Law, pp. 398, 403. According to the maritime law, the defendants, as principals of the captain of the Atjeh, are clearly liable for the consequences of his negligence."

The contention that the courts of admiralty of Great Britain do not take cognizance of torts for injury to the person committed upon British ships, within the jurisdiction of that country, becomes more or less an unimportant inquiry, if the above position is correct, as this court will not be controlled in its action in that regard. In passing, however, it may be said that the authorities do not appear to be entirely free from conflict. The following English cases seem to support the doctrine of the admiralty jurisdiction in such cases: The Sylph, L. R. 2 A. & E. 24; The Guld Faxe, L. R. 2 A. & E. 325; The Beta, L. R. 2 P. C. 447. And originally, and independently of statute, the courts of admiralty of Great Britain took jurisdiction of cases arising in tort committed upon the high seas. The Ruckers, 4 C. Rob. 73; The Hercules, 2 Dod. 353; The Lagan or Mimah, 3 Hagg. A. D. N. 418; The Volant, 1 Wm. Rob. 383.

The cases questioning this jurisdiction have largely arisen upon the construction of the effect of the seventh section of the British admiralty act of 1861, the language used being: "The High Court of Admiralty shall have jurisdiction over any claim for damages done by a ship." And the controversy has been over the words, "damage done by any ship," the claim being to limit the meaning of those words to injuries done by the ship itself, as distinguished from its navigators, personally. The cases chiefly relied on by respondent to support its contention are those of The Vera Cruz, 10 A. Cas. 59–72; The Theta [1894] Prob. Div. 281. While these cases are, in some respects, favorable to the view contended for, in their essential features they afford but little support to the same.

The first-named case was one to recover damages, under Lord Campbell's act, for the loss of the life of libelant in a collision exclusively within the jurisdiction of Great Britain, and it was held that the admiralty court of Great Britain, under the act of 1861, above referred to, did not have jurisdiction in rem to entertain such actions.

The latter case was an action in rem against the ship, and not against her owners, to recover damages for an injury sustained by falling into a hatchway of a ship moored to a British dock. This case turned upon the construction of the seventh section of the act of 1861, above referred to. In argument, special comment was made upon the fact that the Theta was not on the high seas at the time the injuries were sustained, but in the body of a county, and was being used merely as a gangway to enable the plaintiff, who was a stranger to the vessel, to cross to his own ship. No suggestion is made in this case as to whether or not the action in personam against the owners of The Theta would lie.

Notwithstanding the decision of The Vera Cruz, supra, in The Bernina, 11 Prob. Div. 31, the admiralty took cognizance of cases for loss of life, arising under Lord Campbell's act, in personam, and, upon appeal to the Court of Appeals (12 Prob. Div. 58), and subse-

quently to the House of Lords (13 App. Cases, 1), the jurisdiction was sustained. The latter doctrine is certainly more in consonance with the decisions in this country, where admiralty takes jurisdiction of this class of cases. Ex parte Gordon, 104 U. S. 515, 26 L. Ed. 814; The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358; The Norwalk (D. C.) 55 Fed. 98; The Glendale, 26 C. C. A. 500, 81 Fed. 633, 42 U. S. App. 546. And there would certainly appear to be no reason why, if the admiralty jurisdiction is extended to this class of cases, which are not actionable, independently of statute, it should not, in suits in personam, afford relief in cases of tort of the character sued for here, which were actionable at common law.

This case is one to recover damages for personal injuries sustained upon the high seas, and is clearly within the maritime jurisdiction of the courts of admiralty of the United States. Such courts have a general maritime jurisdiction, and take cognizance of any case embraced within the general maritime law and jurisdiction, whenever the res or person to be affected is within the reach of its process. This doctrine would seem to be too well settled, and of too ancient acceptation, to admit of serious doubt or cavil at this late day. The statutes of the United States clearly recognize this jurisdiction. Rev. St. § 563, par. 8 [U. S. Comp. St. 1901, p. 457].

In an early decision (Delovio v. Boit et al., 2 Gall. 398, Fed. Cas. No. 3,776), Mr. Justice Story, sitting on circuit, in a very exhaustive opinion on this entire subject, enunciated this principle, and traced the ancient history of the law in this regard. He said:

"It seems, however, that at a very early period the admiralty had cognizance of all questions of prize; of torts and offenses, as well in ports within the ebb and flow of the tide as upon the high seas; of maritime contracts and navigation. * * *"

This has been the accepted doctrine in this country from the earliest period: Taylor v. Carryl, 20 How. 586, 611, 15 L. Ed. 1028; The Maggie Hammond, 9 Wall. 435, 457, 19 L. Ed. 772; The Belgenland, 114 U. S. 355, 364, 369, 5 Sup. Ct. 860, 29 L. Ed. 152; The Russia, 3 Ben. 471, Fed. Cas. No. 12,168; Id., Fed. Cas. No. 12,169.

And while it is true that the District Court has discretion, apart from statute or treaty, to accept or decline jurisdiction of an admiralty suit in rem, for a maritime tort committed at sea, and brought between foreigners or against a foreign vessel (The Noddleburn [C. C.] 30 Fed. 142; The City of Carlisle [D. C.] 39 Fed. 807, 5 L. R. A. 52; The Belgenland, 114 U. S. 355, 365, 5 Sup. Ct. 860, 29 L. Ed. 152), still this is not true of a case like the present one, and, if true, the discretion should not be exercised to decline the jurisdiction. In the last-named case, at page 365, 114 U. S., page 865, 5 Sup. Ct., 29 L. Ed. 152, the Supreme Court, speaking through Mr. Justice Bradley, said:

"But, although the courts will use a discretion about assuming jurisdiction of controversies between foreigners in cases arising beyond territorial jurisdiction of the country to which the court belongs, yet where such controversies are communis juris—that is, where they arise under the common law of nations—special grounds should appear to induce the court to deny its aid to a foreign suitor when it has jurisdiction of the ship or party charged. The existence of such jurisdiction in all such cases is beyond dispute; the only question will be whether it will be expedient to exercise it."

Here we have an American passenger, seeking to recover damages in personam of the owners of a British ship, because of the alleged negligence of the ship's navigators on the high seas, and in the action an attachment has been sued out pursuant to admiralty rule No. 2, and levied upon the property of the respondents, found within this judicial district. This procedure conforms to the settled practice of the federal courts in admiralty in this class of cases, and the jurisdiction is undoubted. Manro v. Almeida, 10 Wheat. 473, 484, 485, 6 L. Ed. 369; Atkins v. Disintegrating Co., 18 Wall. 304, 21 L. Ed. 841; Devoe v. Mfg. Co., 108 U. S. 401, 2 Sup. Ct. 894, 27 L. Ed. 764; In re Louisville Underwriters, 134 U. S. 488–490, 10 Sup. Ct. 587, 33 L. Ed. 991.

It is equally well settled, both by the English and American authorities, as to what law should be applied, in this class of cases, between parties or ships of different nationalities, arising on the high seas, not within the jurisdiction of any nation. It is the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted. The Dumfries, 1 Swabey, 63; The Wild Ranger, Lush. 553; The Leon, 6 Prob. Div. 148; The Scotia, 14 Wall. 170, 20 L. Ed. 822; The Scotland, 105 U. S. 24, 29, 26 L. Ed. 1001; The Belgenland, 114 U. S. 369, 5 Sup. Ct. 860, 29 L. Ed. 152.

It would be both novel and startling, at this late day, to enunciate the doctrine that an American passenger on a British ship was without remedy against the ship's owners, who contracted with him for a safe passage, to recover damages for injuries sustained during a voyage on the high seas, by the negligence of those navigating the ship; and it would be equally anomalous if the admiralty courts of this country, the only courts, by the constitution and laws, given special maritime jurisdiction upon the high seas, should be impotent to afford such relief.

Coming to the facts. The question of whether the libelant was taken against his will to the port of Galveston may not be a matter of material moment to the merits of the controversy, but in passing it may be said that the evidence supports his contention in that regard. Certain it is that he is strongly supported in his statement in this respect by Dr. Miller, the one other passenger examined, the third passenger being dead, and as against their statement is that of the ship's master, mainly unsupported; and all the facts and circumstances bear out libelant's rather than respondent's contention in this respect; and it is also certain, from the master's own statement, that he would have been carried if he had protested, as he admits that it would have been impracticable to have landed him at New Orleans, or at Port Eads, with a view of his reaching New Orleans.

In determining the question of fault in bringing about the misfortune, nothing need be said as to the degree of care required of the respondent ship as a carrier of passengers. The law is too well settled to need special comment at this day, further than to say that the highest degree of care and caution is required, and that the presumption of negligence is against the carrier where injury is sustained by a

passenger. The New World, 16 How. 469, 14 L. Ed. 1019; The City of Panama, 101 U. S. 453, 25 L. Ed. 1061.

The conflict in the evidence in this case is less than is usual in admiralty cases of this character, and it turns entirely upon whether the libelant was guilty of negligence in being where he was at the time he received his injury, and whether any proper precaution had been taken by the ship to advise him of the danger of his position, or any warning had been given him specially in reference thereto. It is only as to these two questions that there is any apparent conflict of evidence.

The court has had the advantage of an oral examination of the libelant, and of Dr. Miller, the other passenger examined, both of whom were on shipboard at the time; and while the same opportunity to see and hear the witnesses as to the accident, examined by the respondent, was not afforded, that evidence having been taken by deposition, still the same has been carefully read and considered, and, upon the whole case, the conclusion reached is that the libelant was not guilty of negligence in being where he was when he received the injury.

It is true that the officers of the ship testified that the passengers were not allowed to use the main deck of the ship, but the preponderance of the evidence clearly shows that this was an afterthought. Both the libelant and the other passenger on board testify that it was their chief place of resort, and that they, and the muleteers, or laborers, and their foremen, were given the free use of this deck, and that as to the latter they had no other place to occupy. It is also testified to by the libelant's witnesses, and undenied, that, so far from its being improper for libelant to have been on that deck, on the entire morning of the day that he received his injury, Dr. Miller, another passenger on board, worked with the mate, aiding in putting overboard a part of the same cattle fixtures; and, confessedly, there were no rules or regulations prescribed for the government of those on shipboard prohibiting them from the use of this deck.

The conflict as to the warning given should also be solved in favor of the libelant. He insists that no admonition whatever was given, or suggestion made to him, not to use this particular deck, and in this he is thoroughly supported by the other passenger, Dr. Miller. Dr. Miller, in substance, related the circumstances of the accident to be that after dinner, at 1 o'clock, he and libelant took a nap until 4 o'clock, at which time they drank some tea and played a game of solitaire euchre; that he then went on deck, and Dr. Pouppirt went on the bridge; that he had not been on deck five minutes before he went forward on the bridge, and Pouppirt came on deck; that he had not been on deck more than from three to five minutes before the accident happened; that libelant was standing about amidships, between the bridge and forecastle; that the boatswain had charge of some men on the starboard side, about 10 feet forward on the main deck, and that the mate was on the forward part of the vessel, on the port side, with some men; that the stick of timber was about 50 feet long, 6 by 8, and was very heavy, and, more than that, that it had an upright about 8 feet long and about 6 inches square, which

had not been knocked off; that one of the uprights to the stick of timber was a stanchion, and that that was still on; that on attempting to take the stick of timber to the side of the vessel they found that they did not have enough men to shove it over, and tried to cant it forward, but could not, on account of the mast, and they finally got additional men to have sufficient force to throw it over the side of the vessel. The timber was with the upper end forward, and the back end towards the stern of the vessel, more or less. When the front end struck the water the other end canted with terrific force. Libelant was standing four or five feet from the vessel (meaning, I suppose, from the side). He was facing the vessel, apparently looking at the first mate at work there. There was a cry of, "There she goes," or something like that. He turned around, and in the act of turning he saw the timber strike Dr. Pouppirt, and saw him fall unconscious to the floor.

Whereas, the master of the ship claims that as libelant proceeded from the bridge deck down to the main deck, going down the ladder, he sung out to him, "Come away, you will get hurt; you have got no business down there." And that he (Dr. Pouppirt) sung out, and waved his hand, "I am all right." That he then went forward on the deck, and he subsequently saw him forward with the mate, who was working on the port side, and from there go over to where the boatswain was putting the timber over, on the starboard side. That he (the master) was then on the bridge, on the port side, and saw libelant standing near the starboard side, abaft the forerigging, on the fore main deck, and forward of the timber that was being launched, probably about a foot from the ship's rail and about two feet from the timber.

Dr. Crow, the ship's doctor, who was also on the bridge, testified that this warning was given about 45 minutes before the accident; and subsequently, upon cross-examination, he said that Pouppirt had been on the main deck at least an hour before he was injured, and that the warning that he heard was not to stand where the work was going on, and that he did not hear any warning not to go upon the deck. He testified on the examination in chief that he could not remember exactly what was said, but that Pouppirt was on the main deck at the time, and about 35 feet from where the long timbers were being thrown over, and that the warning was to the effect that it was a dangerous place for him, and to get out of the way; that Pouppirt was about 40 feet off at the time, and that he did not hear him make any answer to the warning. But, in answer to the question of whether he paid any attention to it or not, he replied, "He looked up and smiled." This statement as to the warning is positively denied by both the libelant, and the other witness present. Dr. Miller said nothing of the sort occurred; and, so far as the master's evidence can be said to be supported by that of the ship's physician, the latter's evidence should receive but little weight, in the light of his cross-examination in this regard; as it appears from a letter written by him on March 7, 1902, nearly four months before his examination, when requested to give an account in detail of what oc-

curred at the time of the accident, and specifically whether Pouppirt was warned or notified by any one not to stay where he was hurt, he replied, after going somewhat into detail as to the occurrence: "Don't know whether the doctor was warned not to stand on the deck or not. A few minutes before the accident the captain remarked to me that Pouppirt should not stand on that deck while the men were at work."

Certain it is, if the captain ever gave the warning, standing where he was on the bridge, with the libelant down on the main deck, where it is testified by the respondent's witness, Crow, he was, it is quite apparent that it could not have been heard by libelant.

Assuming the warning, however, to have been given at the time that the ship's master said that it was, viz., three-quarters of an hour before the accident, as libelant was going down the ladder to the main deck, it would not, under the circumstances of this case, avail to relieve the respondent from responsibility. The master remained, as he claims, on the bridge, overlooking the dangerous work at hand. The chief officer was on one side of the ship, on the forward deck, in charge of one squad of hands, and the boatswain was on the other, with another squad, each engaged in this hazardous employment; and it appears from this evidence, as testified by the master himself, as above recited, as well as when called on re-examination, that libelant was seen, according to their contention, standing at the point where he was injured, immediately in front of this timber, on the starboard side of the ship, and near to the side; which statement is corroborated by the boatswain, who testified that he was standing between the timber and the doctor when it was thrown over, and that he avoided injury himself by ducking his head as he sang out, "Stand clear!" and that libelant could have escaped likewise. And one of the seamen, the only one examined, and who was standing on the same side of the timber with the boatswain and libelant, also testified that, upon the timber getting more than half over the rail, they sang out, "All stand clear!" and dropped—that is, below the rail—and the timber passed over their heads and hit libelant.

This was, manifestly, so far as this libelant was concerned, negligence of the grossest kind. According to respondent's witnesses, libelant had been standing about amidships, from whence he went to the starboard side of the ship, and was there seen by the master of the ship and the boatswain within the full sweep of a piece of timber of this length, which, upon its striking the water, with the ship going at full speed, in order to avoid inevitable injury from, even the persons handling the timber had, upon letting go of the same, to fall below the rail of the ship; yet no warning was given to nor precaution taken for this passenger. A more dangerous undertaking could not well have been carried on at the time, as was known to the persons engaged in it and to the officers of the ship, but naturally not to this passenger; yet, as their evidence shows, he was allowed, without any cessation of the work, to walk around and upon this deck from place to place, and when in a position of imminent peril, seen by the captain and other officers of the ship, no protection whatever was afforded him.

Had libelant known of the danger in which he was placed, by the reason of the casting off of this piece of timber of unusual length, while he was in his position, he would not have been afforded even the protection that the seamen themselves had—of dropping below the rail, knowing just when it was to be turned loose, which was some protection. They could possibly avoid danger by dropping at the right time. But libelant was not so circumstanced. He could not know the moment the hold on the timber was to be released.

It is true he had seen the work of throwing over the timbers going on during the day, but there was nothing special to attract his attention as to the danger, and there might not have been real danger in casting off a piece of ordinary length. The ship itself was light— some 23½ to 24 feet out of the water; but the putting over of this piece was an entirely different matter, as to the dangers of which these officers of the ship, all of whom have endeavored to show that they were experts on the subject, knew fully, and of which the libelant was ignorant. Passengers have a right to be relieved from hazards of this character, and even as to the seamen the experiment was dangerous enough. N. J. Steamboat Co. v. Brockett, 121 U. S. 637, 7 Sup. Ct. 1039, 30 L. Ed. 1049; The Nederland (D. C.) 7 Fed. 926. The negligence of those in charge of the ship being manifest and clearly established, respondent must answer in damages for the injuries sustained by libelant.

This brings us to the question of what damages should be awarded libelant for the injuries sustained, and it may be said in this connection that this is a case of more than usual importance by reason of the very serious injuries sustained by libelant, and the fact that he was a young man, a veterinary surgeon by profession, and one that had succeeded in his business. He was 28 years of age, had practiced his profession some five years, and enjoyed a practice of about $3,000 a year. At the time he received his injuries he was in the service of the British government, making at least that rate per annum. The injuries sustained by him were of the most dangerous character. One of the physicians described them as being the most serious of the kind that he had ever known.

The blow sustained was on the right side of the head, not far above the ear, breaking the skull, which caused paralysis of the left side of the body, and from which he has not and the physicians testify will never recover. The limbs of the paralyzed side have become very much smaller than those on the other side of the body. The hole is still in the head, and cannot be healed. He is subject to spasms, with a strong tendency to epilepsy, and from which, the evidence shows, he is liable to fall and die at almost any time. He is incapacitated to work or follow his usual avocation. His sufferings were very great. He was taken, after several days' detention on shipboard, to a hospital at the port of Galveston, Tex., where he remained for some time in an unconscious condition, and a most difficult and delicate operation was performed upon him, for which he was charged $2,000, and on account of which he has paid the sum of $900. In this hospital he was confined for several weeks, his life being in imminent peril, and was finally sent to his home in Kansas, where he was

for some months confined on account of his injuries, and during all the time, as he testified, he suffered intensely.

Just what should be awarded to him under such circumstances is difficult of ascertainment, and it is so largely a matter of discretion that it is an exceedingly delicate as well as unpleasant duty for a court to discharge. Viewing the case in all its aspects, an award of $12,000 is thought to be only reasonable, and such as should be allowed, having regard to the settled rules and current weight of the admiralty decisions on the subject of damages in this class of cases. The Juniata, 93 U. S. 337, 340, 23 L. Ed. 930; The City of Panama, 101 U. S. 454, 464, 25 L. Ed. 1061; The Mineola (D. C.) 44 Fed. 143; The William Branfoot (D. C.) 48 Fed. 915; The Pioneer (D. C.) 78 Fed. 600, 609; The Homer (D. C.) 99 Fed. 795, 800; Id., 48 C. C. A. 465, 109 Fed. 572, 576; The Anchoria (D. C.) 113 Fed. 982, 985.

A decree may therefore be entered in favor of the libelant for the sum named.