### THE SCOTIA.

1. Although it is the clear duty of an ocean steamer sailing at night to keep out of the way of a sailing vessel, yet if the course of the sailing vessel, when first seen, is such, that compared with her own no collision is probable, the steamer is not bound to change her course. She need but watch and see that the courses of the two vessels are preserved. It is only when the sailing vessel does change *her* course, so as to render a collision possible, that the steamer must change hers also; and if she then makes the proper manœuvres to take herself from the sailing vessel, and when collision becomes more probable slows, stops, and backs, all as the best judgment that can be formed in the emergency suggests, she is not liable for the collision.

2. The statutes of the United States and the orders in council of Great Britain having each prescribed the sort of lights which, on the one hand, their steamers are to carry at night, and the different sort which, on the other, their sailing vessels are to carry, and both nations adopting in this form the same distinction in the sorts of lights for the two sorts of vessels respectively, the court declares that where a British steamer and an American sailing vessel are navigating at night in the known path of vessels navigating between the United States and Great Britain, so that there is a reasonable probability that vessels in that path would be either American or British, a steamer may, in the absence of knowledge, act upon the probability that a vessel whose light she sees while she cannot distinguish at all the vessel herself, is such a vessel as her light indicates, and apply the rule of navigation common to the two countries accordingly.

3. Under the existing statutory regulations of the United States and Great Britain (stated more fully *infra*, pp. 171–2), both of which on the one hand require sailing vessels to carry colored lights and not to carry a white one, and both of which on another require steamers to carry a white light at their mastheads,—when an American sailing vessel carries in mid-ocean at night a white light hung at her bow, fastened low

---

* Ex parte Crane, 5 Peters, 194; Ex parte Bradstreet, 7 Id. 634; Insurance Co. v. Wilson, 8 Id. 304; Ex parte Many, 14 Howard, 25.

down, and carries no colored lights anywhere, a British steamer, not able to discover what she really is, may be excused for mistaking her for a steamer, and a steamer at a distance instead of near at hand.

**4.** *Semble* that the navigation laws of the United States requiring different sorts of vessels to carry different sorts of lights, bind American vessels on the high seas as well as in American waters, and that the people of other nations navigating the high seas may properly sue our citizens in our courts for injuries occurring through the disregard of them.

**5.** The rules of navigation established in the British orders in council, of January 9th, 1863 (prescribing the sorts of lights to be used on British vessels), and in our act of Congress of 1864 having, before the close of the year 1864, been accepted as obligatory by more than thirty of the principal commercial states of the world, including almost all which have any shipping on the Atlantic Ocean, were in April, 1867, to be regarded, so far as relates to the vessels of these states, as laws of the sea. And of the historical fact that by common consent of mankind they have been acquiesced in as of general obligation, courts may take judicial notice.

**6.** These rules having prescribed that sailing vessels should not carry a white light, and that steamers should carry one at their masthead, a sailing vessel which carried a white light low down, so that she looked like a steamer yet at a distance, was held to be without remedy where she had collided with a steamer which mistook her for another steamer and manœuvred accordingly.

APPEAL from the Circuit Court for the Southern District of New York, in a case of collision between the American ship Berkshire and the British steamer Scotia, by which the ship was sunk and totally lost.

On the 9th of January, 1863, a British order in council, authorized by virtue of the Merchant Shipping Amendment Act of July 29th, 1862 (25 and 26 Victoria), made a body of "Regulations for preventing collisions at sea." Among these were "Rules concerning lights," and "Steering and sailing rules."

In the first class were these:

### LIGHTS FOR STEAMSHIPS.

ART. 3. Sea-going steamships when under way shall carry—

(*a*) At the foremast head, a bright white light . . . of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least five miles.

(*b*) On the starboard side a green light, &c., visible on a dark

night, with a clear atmosphere, at a distance of at least two miles.

(c) On the port side a red light, &c., visible on a dark night, with a clear atmosphere, at a distance of at least two miles.

(d) The said green and red side-lights shall be fitted with inboard screens, projecting at least three feet forward from the light so as to prevent these lights being seen across the bow.

### LIGHTS FOR SAILING SHIPS.

ART. 6. Sailing vessels under way . . . shall carry the same lights as steamships under way, *with the exception of the white masthead lights, which they shall never carry.*

In the steering and sailing rules was this one—

### SAILING SHIP AND SHIP UNDER STEAM.

If two ships, one of which is a sailing ship and the other a steamship are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship.

All these regulations, as originally promulgated by Great Britain, were made applicable to all ships, whatever their nationality, within the limits of British jurisdiction, and to British and French ships whether within British jurisdiction or not. The Merchant Shipping Amendment Act, in virtue of which these regulations were passed, provided also that whenever it should be made to appear to the British government, that the government of any foreign country was willing that these regulations should apply to the ships of such country, when beyond the limits of British jurisdiction, Her Britannic Majesty might, by order in council, direct that such regulations should apply to the ships of such foreign country, whether within British jurisdiction or not.

On the 29th April, 1864,* the Congress of the United States passed *its* "act fixing certain rules and regulations for preventing collisions on the water," and these rules as respects sea-going vessels being, to all intents, identical with those above quoted from the British act, the British govern-

---

* 13 Stat. at Large, 58.

ment regarded the act of Congress as an expression by our government, that it was willing that the British regulations should apply to our ships when beyond the limits of British jurisdiction. The British government accordingly, by order in council, directed that the regulations should apply to all sea-going vessels of the United States, whether within British jurisdiction or not.

The governments of various other countries soon also manifested their willingness that the British regulations should apply to their ships respectively, when beyond the limits of British jurisdiction; and orders in council accordingly directed that such regulations should apply to the ships of such countries respectively, whether within British jurisdiction or not. The countries referred to were Austria, the Argentine Republic, Belgium, Brazil, Bremen, Chili, Denmark proper, the Republic of the Equator, France, Greece, Hamburg, Hanover, the Hawaiian Islands, Hayti, Italy, Lubeck, Mecklenburg - Schwerin, Morocco, the Netherlands, Norway, Oldenburg, Peru, Portugal, Prussia, the Roman States, Russia, Schleswig, Spain, Sweden, Turkey, Uruguay. These orders in council were published at various dates, from January 13th, 1863, to February 6th, 1866. All countries named except Denmark, Greece, the Hawaiian Islands, Schleswig, and the United States, adopted the regulations in 1863.

With these various statutes and orders in existence, the Scotia, a British steamer of the Cunard line, steering west by north one-half north, was sailing about midnight on the 8th of April, 1867, near mid-ocean, from Liverpool towards New York. Her lookouts were properly set, and her lights rightly stationed, that is to say, a white light was at her masthead, a green light on her starboard or right side, and a red light on her port or left side; all burning brightly.

Sailing at the same hour, equally about mid-ocean, the Berkshire, a sailing ship belonging to the American marine, was on her voyage from New Orleans to Havre, and with a wind free, blowing from about south-southwest, was pursuing a course southeast by east one-half east, as indicated by the

following diagram. The courses of the two vessels thus intersected at an angle of exactly one point.

Place of Collision.

The Berkshire had no colored lights anywhere; nor any light but a white light, and this was at her bow, fastened to her anchor-stock, and raised about four feet above her deck. Of course, if the Scotia should mistake this light for a light fastened on the *masthead* of the Berkshire, she would infer from its apparent proximity to the water that the Berkshire was far off.

The Scotia was first seen from the Berkshire bearing one point or so off the ship's port bow, at a distance apparently of five or six miles. Then the steamer's white masthead light only was seen.

Immediately on her sighting the steamer, which was at most from fifteen to twenty minutes before the collision, her mate gave an order to luff, and she did luff, so as to head more into the wind. The effect of this was to make her go further to the south and thus diverge farther from the course of the steamer. She continued in this new direction ten or fifteen minutes, when, moving at the rate at which it was proved that the vessels were moving, she could not have been more than one or two miles from the Scotia. Her helm was then suddenly put to starboard, then steadied for a brief period, then put hard a-starboard and kept there, thus pointing her directly across the bow of the approaching vessel. By keeping her helm hard a-starboard she was made to

change her course constantly.   The diagram on the pre-ceding page may perhaps assist the reader's comprehension. The dotted lines represent the Berkshire's movements.

Before she bore away the red light of the steamer was seen by her wheelsman, and probably by her lookout, if not indeed by her master.

The Scotia saw the white light on the Berkshire in due time, and first saw it off her port bow, from one to two points.   Seeing a white light, the deck officer of the Scotia took the vessel for a steamer, and from the proximity of the light to the water inferred that she was far off; coming in fact just above the horizon, and accounting for the non-appearance of the usual colored lights because he supposed that they had not come up to view.*   He thus not only sup-posed the Berkshire to be a steamer, but judged that the supposed steamer was at a much greater distance than it was in fact.   As already signified, the location of the light war-ranted the supposition, and its color gave no indication that it was on a sailing vessel.   After its discovery the ship's light opened on the steamer's port bow; how much it opened was a matter somewhat agitated by the witnesses and the counsel, though this court considered that matter immaterial, because if it receded at all it indicated that there was then no danger of collision without some change of course, and consequently no necessity to take measures to avoid one. The weight of the evidence was that the ship had not then turned her course northward, but if she had it was still proved that her light opened on the Scotia's port side, after it was first seen, and before the steamer's course was changed. Soon after, and because of the ship's change of course, her light began to close in on the steamer's bow, and then for the first time was there any apparent danger of collision.   Then the Scotia's helm was immediately ported, then hard ported, and observing that the ship's light still closed in, orders were given, in quick succession, to half-speed, slow, reverse, and

---

* The "Rules concerning Lights," it will be remembered, see *supra*, pp. 171–2, requires the white light of steamers to be such as shall be visible five miles off; while the colored lights need be visible but two miles off.

back, but notwithstanding these orders, which were all promptly obeyed, the vessels came together in the position indicated on the diagram, and the Berkshire with her cargo went right down in mid-ocean.

The owners of the Berkshire, one Sears and others, now for themselves and the owners of the cargo, filed their libel in the District Court at New York, to recover the loss sustained by the collision. The libel charged, of course, that the collision occurred through the fault of the Scotia. The District Court decreed for the respondents. The view of that court was, that courts of admiralty were now required to take judicial notice of the existence of the British orders in council, and of the fact that so numerous maritime states had accepted them; that so general an adoption by such states of one rule had made a rule and usage of the sea; that by this rule and usage—in other words, by the law of the sea as it existed at the time of the collision—the Berkshire was bound to exhibit colored lights, and colored lights alone; and that as she had not done so, she had no remedy.

The decree, therefore, was, that the libel be dismissed; and the Circuit Court affirming this decree, the case was now here for review.

*Mr. J. C. Carter, for the appellants:*

The theory of the libellants is readily perceived. The Scotia's white light was first made about one point on the Berkshire's bow, and some twenty minutes before the collision. The mate supposed it to be a sailing vessel standing to the westward and closehauled on the wind. As the Berkshire was sailing free, it was her duty to keep out of the way of other sailing vessels who were closehauled. The man at the wheel was therefore ordered to keep his luff, that is, to run nearer to the wind, which was done, and the course of the Berkshire thus changed to windward about three-quarters of a point. Finding that the luffing did not have the effect of shaking the light off his bow, and supposing that the course of the vessel was nearly opposite to his, but really crossing his bow, he deemed it the safest course to starboard the helm and bear away before the wind while the light was yet a great way off and there was ample time. This was accordingly done. The light of the Scotia was soon under the effect of the starboarding brought upon the starboard side. The ship was kept away under her starboard helm, until the light was brought abaft the beam on the starboard side, and then the helm was steadied. Soon after a red light was discovered, and then they were satisfied that the vessel was a steamer. The helm was ordered again hard a-starboard, but the steamer came up with rapidity and struck the ship, breaking her open.

Now we think that this is a view which ought to exculpate the ship. She did just what it was natural for her to do, and, in the darkness of the night, proper. It is perfectly settled in this court that it is the duty of steamers to keep clear of sailing vessels. No rule of the sea has been as emphatically declared of late times. We need not quote authorities to that point. The Scotia, in view of the great liability to error as to the position and distance of lights on the

water at night, ought to have somewhat changed her course or slowed up, so soon as she saw how nearly the courses met.

The argument of the other side of course will be that we did not carry the side lights prescribed by the act of Congress and by the British admiralty regulations. This is admitted by us. Thus it is said that we violated our statutes. But the act of Congress prescribing the lights which sailing vessels are to carry is but a municipal regulation of the United States; and the Scotia cannot avail herself of such a statute to convict an American vessel of a *tort* on the high seas. All the questions in controversy are to be determined without reference to the municipal laws of either nation; and solely according to the general maritime law; and by that law there was no obligation on the Berkshire to exhibit any side lights, or not to exhibit a white light.

This precise question has arisen in England, and has been determined by a series of decisions of the highest authority. The question has arisen in every variety of form; sometimes the defendants, foreigners, seeking to bind the plaintiffs, British citizens, by the provisions of British statutes, and at others, British plaintiffs claiming the benefit of British statutes against foreign defendants. But the decision has been the same in all.*

Nor is the position tenable, that inasmuch as the obligations resting on the Scotia by a British statute relating to lights were the same with those resting upon the Berkshire, the rule should be enforced in this suit on some principle of *reciprocity*. That question is strikingly concluded by authority. It happened to the principal libellant (Mr. Sears), to invoke in his own behalf, in a British tribunal, on this

---

* Sir William Scott, in the Carl Johann, referred to in the Dundee, 1 Haggard's Admiralty, 113; Nostra Signora de los Dolores (Lord Stowell), 1 Dodson, 290; The Zollverein (Dr. Lushington), Swabey, 96; Cope *v.* Doherty (Vice-Chancellor Sir William Page Wood), 4 Kay and Johnson, 367; S. C., on appeal, 2 De Gex and Jones, 626; The Saxonia (Dr. Lushington, and on appeal to P. C.), 1·Lush. 410; The Chancellor, 4·Law Times, New Series, 627.

very notion of reciprocity, in a collision cause, in which his ship was libelled by British citizens, the protection of a British statute; and he supported his claim by proof that the United States had made a like enactment. The question was most elaborately considered by Dr. Lushington, and determined against him.* In the face of this decision, ·it would be a singular exhibition of *reciprocity*, to yield to, the claim of the Scotia.

There can be no reasonable doubt that this case is to be governed, not by the municipal law of either the United States or Great Britain, but by the maritime law. The main question is, what is that law? It is conceded that, at least until a recent period, it imposed no obligation upon either of the vessels to carry colored lights, or precluded either from carrying a white light. Now, has this law been changed? No change has been proved, nor any evidence offered tending to show such a change. Indeed, it is believed to have been the practice at the time, and to a great extent is now, for sailing vessels *not* to exhibit colored lights when away from the shore. But, conceding that any number of municipal ordinances were proved, they do not make any change in the maritime law. The high seas are outside of the territory of municipal powers, and their laws have no force there. Nor can any force be derived from them when taken together. It cannot be maintained when the laws of Great Britain, the United States, and France have, neither separately nor collectively, any effect whatever on the sea, that still if the concurring statutes of substantially all other maritime states were added, the combined effect would be to give to them effect there. How many nations must join? Who is to determine what is a maritime state, in order to know whether all have joined? Who or what is to apprise the unlettered mariner that the municipal statutes of all nations have at last been brought into harmony?

The municipal ordinances relied on by the District Court

---

* The Wild Ranger, 7 Law Times, N. S. 725 and 729; S. C., 1 Lushington, 553.

do not constitute a body of statutes enacted by the nations collectively, nor do they constitute anything in the nature of a convention or treaty; at all events, not so far as the United States are concerned, and the other powers, save Great Britain. They are municipal statutes, and nothing more. Great Britain, indeed, by her act, seems to indicate that in her view, as soon as other nations pass acts similar to her own, *she* will deem this to be an assent to a proposition made by her, and will then regard a convention as agreed upon, which her courts are to respect; and it may be very proper for her courts to act accordingly. But the United States have never done anything of the kind.

On the view of the District Court, that these concurring municipal enactments change the law of the sea, the question arises, at what point does this change become effectual? Is it when two, or three, or four, or what number of maritime states have concurred in the legislation? In the absence of any authoritative declaration by his own country, when is the American navigator to know that the law springs into operation? In short, the whole view of the District Court, whose decree was affirmed in the Circuit Court, is so embarrassed with difficulty, that however plausible it may be it cannot be safely maintained in practice.

*Messrs. D. D. Lord and E. C. Benedict, contra.*

Mr. Justice STRONG delivered the opinion of the court.

It is plain that had the ship continued on her course after she first saw the steamer's bright light, there could have been no collision. And, still more, had she not afterwards and when near the steamer put her helm to starboard she would have been out of all danger. Even when she first sighted the Scotia she had passed the point at which her course and that of the steamer intersected. This is a necessary sequence from the facts that the angle between the courses of the two vessels was exactly one point, and that the light of the steamer, when first seen, bore from a point to a point and a half off her port bow. Besides, when the

ship was first seen from the steamer, her bearing, it is clearly proved, was from a point to two points off the steamer's port bow. Such a bearing was impossible unless the ship had already crossed the line of the Scotia's course, and passed the point at which the vessels could have come together unless one or the other had taken a new direction. They must have passed with a wide berth between had the ship made no change of her helm, or had she kept her luff in obedience to the mate's order. But by putting her helm hard a-starboard she was made to change her course constantly till the collision occurred. Even before she bore away the red light of the steamer was seen by her wheelsman, and probably by her lookout, if not indeed by her master, doubtless in time even then to escape harm. Had it not been then for the unfortunate order of the master to starboard her helm, and bear away before the wind, this case could not have arisen.

It must, however, be conceded that this, of itself, is not sufficient to excuse the Scotia, if she failed to adopt such precautions as were in her power, and were necessary to avoid a collision. Meeting a sailing vessel proceeding in such a direction as to involve risk, it was her duty to keep out of the way, and nothing but inevitable accident, or the conduct and movements of the ship, can repel the presumption that she was negligent, arising from the fact of collision. But this duty of the steamer implies a correlative obligation of the ship to keep her course, and to do nothing to mislead. Nor is a steamer called to act, except when she is approaching a vessel in such a direction as to involve risk of collision. She is required to take no precautions when there is no apparent danger.

Was, then, the Scotia in fault? If she was, the fault must have been either that she did not change her helm sooner, or that she ported, or that she was unjustifiably late in slackening her speed and reversing her engines. No other fault is imputed to her. We have already said that she was not bound to take any steps to avoid a collision until danger of collision should have been apprehended, and we think

there was no reason for apprehension until the ship's light was seen closing in upon her. Assuming for the present that she had no right to conclude that the light was on a steamer and to manœuvre accordingly, and, therefore, that it was her duty to keep out of the way, it is still true that all her duty at first was to watch the light in order to discover certainly what it was, and to observe its course and notice whether it crossed her own course. It is not the law that a steamer must change her course, or must slacken her speed the instant she comes in sight of another vessel's light, no matter in what direction it may be. With such a rule navigation cannot be conducted. Nor is such a rule necessary to safety. It is, therefore, no fault that, seeing the ship's light off her port bow, apparently at a distance of several miles, the Scotia continued on her course without slackening her speed, until that light began to close in upon her. Then she ported her helm, the obvious effect of which was to take her farther away from the approaching vessel. Then she slowed her engines, stopped and backed, until, at the time when the collision took place, she had almost, if not entirely, ceased to move through the water. Had she starboarded, instead of porting, the movement would have turned her toward the Berkshire, and apparently would have rendered collision more probable. Of the propriety of her slowing her engines, stopping, and backing, there can be no doubt. If, now, it be considered that she had been misled by the nature and location of the light on the Berkshire, which indicated that the ship was at a much greater distance than she was in fact; that consequently the peril came upon her suddenly, leaving short time for deliberation, and if it be considered that she had been brought into this extremity, first, by the ill-judged and causeless change of the ship's course, and, second, by the persistent effort of the ship's master to cross her bow after he had seen her red light, and discovered certainly that she was a steamer, it would be unjust to impute to her as a fault that she did what she ought to have done, had the approaching vessel been in fact a steamer, and that which at all events seemed

most likely to avoid a collision.   Certainly it was not her fault that she did not know the Berkshire to be a sailing vessel.   And in all human probability the measures taken by her to avoid a collision would have been successful if they had not been counteracted by the constant veering of the Berkshire, with her helm kept hard a-starboard.

Independently, therefore, of any statutory regulations, and looking to the facts with reference to the old maritime law alone, as it was before any modern legislation, we think the Scotia was not chargeable with fault.

But we think the Scotia had a right to conclude that the Berkshire was a steamer rather than a sailing vessel, and that, when first seen, she was at the distance of four or five miles, instead of being near at hand.  , Such was the information given her by the ship's white light, fastened as it was to the anchor-stock on deck, and no watchfulness could have enabled her to detect the misrepresentation until it was too late.   Both vessels were moving under similar regulations. The Berkshire was an American ship, belonging to the mercantile marine, and she was required by the act of Congress of April 29th, 1864, to carry green and red lights, which she did not carry, and she was forbidden to carry the white light, which she did carry.   By exhibiting a white light, she, therefore, held herself forth as a steamer, and by exhibiting it from her deck, instead of from her masthead, she misrepresented her distance from approaching vessels.   It is clear the Scotia would have been justified in taking her for a steamer had she been known to be an American ship.   But it is insisted on behalf of the appellants that, inasmuch as the act of Congress is a mere municipal regulation, obligatory as a statute only upon American vessels, the Scotia, a British steamer, cannot avail herself of it to fault an American ship, or to justify her own conduct.   Waiving for the moment consideration of the question whether this position is well taken, it is yet true that the Berkshire was under the statute, though on the high seas, and that the Scotia was subject to and sailing under similar regulations (the British orders in council of January 9th, 1863); that the collision

happened in the known path of vessels navigating between the United States and Great Britain, and that there was a reasonable probability that vessels in that path would be either American or British, and would, therefore, carry the lights prescribed by the laws of those countries. The steamer might well, therefore, in the absence of knowledge, act upon that probability, and in the emergency into which she had been brought, might, without fault, apply the rule of navigation common to the ships of both countries.

But, to return to the question, we think that independently of the act of Congress, considered as a mere municipal regulation, the Berkshire was bound to show a green light on her starboard, and a red light on her port side, without exhibiting any white light; and that the Scotia may set up in defence her failure to carry such green and red lights, as also the fact that she did improperly show a white light. And we think that her breach of duty in these respects misled the officers of the steamer, and caused them to act on the assumption that she was a steamer, and therefore under obligation to pass on the port side. If so, the collision was solely due to the fault of the ship. We rest this conclusion not solely, or mainly, upon the ground that the navigation laws of the United States control the conduct of foreign vessels, or that they have, as such, any extraterritorial authority, except over American shipping. Doubtless they are municipal regulations, yet binding upon American vessels, either in American waters or on the high seas. Nor can the British orders in council control our vessels, though they may their own. We concede also that whether an act is tortious or not must generally be determined by the laws of the place where the act was committed. But every American vessel, outside of the jurisdiction of a foreign power, is, for some purposes at least, a part of the American territory, and our laws are the rules for its guidance. Equally true is it that a British vessel is controlled by British rules of navigation. If it were that the rules of the two nations conflicted, which would the British vessel, and which would the American, be bound to obey? Undoubtedly the rule

prescribed by the government to which it belonged. And if, in consequence, collision should ensue between an American and a British vessel, shall the latter be condemned in an American court of admiralty? If so, then our law is given an extra-territorial effect, and is held obligatory upon British ships not within our jurisdiction. Or might an American vessel be faulted in a British court of admiralty for having done what our statute required? Then Britain is truly not only mistress of the seas, but of all who traverse the great waters. It is difficult to see how a ship can be condemned for doing that which by the laws of its origin, or ownership, it was required to do, or how, on the other hand, it can secure an advantage by violation of those laws, unless it is beyond their domain when upon the high seas. But our navigation laws were intended to secure the safety of life and property, as well as the convenience of commerce. They are not in terms confined to the regulation of shipping in our own waters. They attempt to govern a business that is conducted on every sea. If they do not reach the conduct of mariners in its relation to the ships and people of other nations, they are at least designed for the security of the lives and property of our own people. For that purpose they are as useful and as necessary on the ocean as they are upon inland waters. How, then, can our courts ignore them in any case? Why should it ever be held that what is a wrong when done to an American citizen, is right if the injured party be an Englishman?

But we need not affirm that the Berkshire was under obligation to show colored lights, or to refrain from showing a white light, merely because of an act of Congress, nor need we affirm that the Scotia can protect herself by setting up the ship's violation of that act. Nor is it necessary to our conclusions that the British rules in regard to lights are the same as ours, though that is an important consideration. We are not unmindful that the English courts of admiralty have ruled that a foreigner cannot set up against a British vessel, with which his ship has collided, that the British vessel violated the British mercantile marine act, on the

high seas, for the reason, as given, that the foreigner was not bound by it, inasmuch as it is beyond the power of Parliament to make rules applicable to foreign vessels outside of British waters. This decision was made in 1856, in the case of *The Zollverein.* A similar rule was asserted also in *The Dumfries,†* decided the same year; in *The Saxonia,‡* decided in the High Court of Admiralty in 1858, and by the Privy Council in 1862. The same doctrine was laid down in 1858, in the case of *Cope* v. *Doherty,§* and in *The Chancellor,‖* decided in 1861. All these decisions were made before the passage of the Merchant Shipping Amendment Act, which took effect on the 1st day of June, 1863. By that act the same rules in regard to lights and movements of steamers and sailing vessels on the high seas were adopted as those which were prescribed by the act of Congress of 1864, and by the same act it was provided that the government of any foreign state might assent to the regulations, and consent to their application to the ships of such state, and that thereupon the Queen, by order in council, might direct that such regulations should apply to ships of such foreign state when within or without British jurisdiction. The act further provided that whenever an order in council should be issued applying any regulation made under it to the ships of any foreign country, such ships should in all cases arising in British courts be deemed to be subject to such regulations, and for the purpose thereof be treated as British ships. Historically, we know that before the close of the year 1864, nearly all the commercial nations of the world had adopted the same regulations respecting lights, and that they were recognized as having adopted them. These nations were the following: Austria, the Argentine Republic, Belgium, Brazil, Bremen, Chili, Denmark, Ecuador, France, Great Britain, Greece, Hamburg, Hanover, Hawaii, Hayti, Italy, Lubeck, Mecklenburg-Schwerin, Morocco,

---

* 1 Swabey, 96.    † Ib. 63.    ‡ 1 Lushington, 410.
§ 4 Kay & Johnson, 367; 2 De Gex & Jones, 626.
‖ 4 Law Times, 627.

Netherlands, Norway, Oldenburg, Peru, Portugal, Prussia, Roman States, Russia, Schleswig, Spain, Sweden, Turkey, United States, and Uruguay—almost every commercial nation in existence.* · Had this libel then been filed in a British court, the Berkshire must have been found solely in fault, because her white light and her neglect to exhibit colored lights signalled to the Scotia that she was a steamer, and directed the Scotia to do exactly what she did.

It must be conceded, however, that the rights and merits of a case may be governed by a different law from that which controls a court in which a remedy may be sought. The question still remains, what was the law of the place where the collision occurred, and at the time when it occurred. Conceding that it was not the law of the United States, nor that of Great Britain, nor the concurrent regulations of the two governments, but that it was the law of the sea, was it the ancient maritime law, that which existed before the commercial nations of the world adopted the regulations of 1863 and 1864, or the law changed after those regulations were adopted? Undoubtedly, no single nation can change the law of the sea. That law is of universal obligation, and no statute of one or two nations can create obligations for the world. Like all the laws of nations, it rests upon the common consent of civilized communities. It is of force, not because it was prescribed by any superior power, but because it has been generally accepted as a rule of conduct. Whatever may have been its origin, whether in the usages of navigation or in the ordinances of maritime states, or in both, it has become the law of the sea only by the concurrent sanction of those nations who may be said to constitute the commercial world. Many of the usages which prevail, and which have the force of law, doubtless originated in the positive prescriptions of some single state, which were at first of limited effect, but which when generally accepted became of universal obligation. The Rhodian law is supposed to have been the earliest system of marine rules.

---

\* See Holt's Rule of the Road, page 2.

It was a code for Rhodians only, but it soon became of general authority because accepted and assented to as a wise and desirable system by other maritime nations. The same may be said of the Amalphitan table, of the ordinances of the Hanseatic League, and of parts of the marine ordinances of Louis XIV. They all became the law of the sea, not on account of their origin, but by reason of their acceptance as such. And it is evident that unless general assent is efficacious to give sanction to international law, there never can be that growth and development of maritime rules which the constant changes in the instruments and necessities of navigation require. Changes in nautical rules have taken place. How have they been accomplished, if not by the concurrent assent, express or understood, of maritime nations? When, therefore, we find such rules of navigation as are mentioned in the British orders in council of January 9th, 1863, and in our act of Congress of 1864, accepted as obligatory rules by more than thirty of the principal commercial states of the world, including almost all which have any shipping on the Atlantic Ocean, we are constrained to regard them as in part at least, and so far as relates to these vessels, the laws of the sea, and as having been the law at the time when the collision of which the libellants complain took place.

This is not giving to the statutes of any nation extraterritorial effect. It is not treating them as general maritime laws, but it is recognition of the historical fact that by common consent of mankind, these rules have been acquiesced in as of general obligation. Of that fact we think we may take judicial notice. Foreign municipal laws must indeed be proved as facts, but it is not so with the law of nations.

The consequences of this ruling are decisive of the case before us. The violation of maritime law by the Berkshire in carrying a white light (to say nothing of her neglect to carry colored lights), and her carrying it on deck instead of at her masthead, were false representations to the Scotia. They proclaimed that the Berkshire was a steamer, and

such she was manifestly taken to be.   The movements of the Scotia were therefore entirely proper, and she was without fault.

DECREE AFFIRMED, WITH COSTS.