## THE MINA.

## THE ATTUALITA.

### (District Court, E. D. Virginia. March 17, 1917.)

COLLISION ⬦82(2)—STEAMSHIPS IN FOG—EXCESSIVE SPEED.

A collision occurred in the Mediterranean Sea at night in a dense fog between the steamship Mina, laden with wheat bound for a French port, and the steamship Attualita, light, bound from Genoa to Gibraltar. The Mina was struck on her port quarter, the stem of the Attualita penetrating for 28 feet, and when the vessels were separated, four hours later, immediately sank. By the testimony from the Mina she was proceeding at slow speed and sounding fog signals, when fog signals were heard ahead slightly to port, and she then altered her course to starboard, and shortly stopped her engine, continuing to blow fog signals. On the appearance of the Attualita off her port beam, coming toward her at full speed, she started full speed ahead under a starboard wheel; but the collision occurred almost at once. On the other hand, the Attualita claimed to be going at slow speed, that she did not hear the fog signals of the Mina until close, and that the Mina at full speed struck her bow at an angle of about 30 degrees, swinging her around. *Held,* that the physical facts shown supported the evidence of the Mina that she was nearly at rest and was struck at right angles by the other vessel at high speed, that the Mina was not chargeable with fault for going ahead under the circumstances, and that the Attualita was solely in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 170, 172–174.]

In Admiralty. Suit for collision by George Basil Mandakas, owner of the steamship Mina and by the master of the Mina as bailee of her cargo, against the steamship Attualita; the Societi Anonima Lloyd Del Pacifico, claimant. Decree for libelants.

See, also, 238 Fed. 909, —— C. C. A. ——.

Kirlin, Woolsey & Hickox, of New York City, and Edward R. Baird, Jr., of Norfolk, Va., for The Mina.

Hughes, Little & Seawell and Hughes & Vandeventer, all of Norfolk, Va., for The Attualita.

WADDILL, District Judge. On the morning of the 28th of July, 1916, about 2:30 o'clock, in the Mediterranean Sea, at a point claimed by the parties to be 40 and 55 miles, respectively, eastward of Gibraltar, the steamships Mina and Attualita were in collision, resulting in the sinking and total loss of the Mina and her cargo.

The Mina was a Greek freight steamer, built in 1908, 2,307 tons gross, 1,473 net register, 300 feet long, 45 feet beam, 20 feet 3 inches deep; and the Attualita, an Italian freight steamer, built in 1900, 4,791 tons gross, 2,999 net register, 390 feet long, 49 feet 9 inches beam, and 28 feet deep. At the time of the collision, the Mina was bound from Buenos Aires, South America, to Cette, France, with a cargo of 4,300 tons of wheat, in bulk and in bags; and the Attualita, light, bound from Genoa to Baltimore, via Gibraltar. The Mina was leaving Gibraltar, and the Attualita bound for that port, en route, for coal.

The libel was filed by George Basil Mandakas, sole owner of the Mina, against the steamship Attualita, for which claim was made, and

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

answer filed, by the Societi Anonima Lloyd Del Pacifico, a corporation, by the ship's master, and the master of the Mina, as bailee, filed a petition in behalf of the owners of the cargo against the Attualita.

The collision occurred in a dense fog, which came on, as conceded by both ships, about 1 o'clock in the morning, and lasted until long after the accident. The bow of the Attualita cut into the port quarter of the Mina, at a point 60 to 65 feet from the stern, penetrating some 28 feet through to the starboard side of hatch No. 4. The Attualita remained fast in the Mina, and the two ships kept in that position until, with the aid of two government trawlers and the engines of the Attualita, they were pulled apart about 6 o'clock in the morning when the Mina immediately sank.

The faults assigned by the vessels, respectively, one against the other, are those usually made in collision cases, namely: Unseaworthiness; shortage in crew and equipment; dereliction in performance of duties by officers and crew; running at excessive speed in fog; failure to give and hear proper fog signals; and improper navigation, upon the ships approaching and discovering the presence of each other.

The Mina's statement is: That from Gibraltar to Europa Point, a distance of about 2 miles, she navigated on a course southeast by south, and from Europa Point took her course to Cape de Gata, the southeasternmost point of Spain, which is the regular course for vessels bound for the south of France from Europa Point to Cape de Gata, being nearly on a straight line, and the compass course nearly east. That she was steering east half quarter south, or, according to the American compass, east one-eighth south; and it was while on this course that the collision occurred. The weather was fine, the sea calm, and the ship's speed about 9 knots. That the master retired to his cabin about 12 o'clock, and while reading was called out at 1 o'clock. He went on the bridge, and remained there until the collision; fog having set in, the weather and sea continuing as heretofore. He at once ordered his engines put dead slow to 2½ to 3 knots, and sounded the usual fog signals, which were blown until the collision. That the ship's whistle was a strong, high-toned one, and could be heard a long distance, and was in good condition. That, while thus proceeding, a British government patrol boat was observed on the Mina's starboard side, going in the same direction with herself, and likewise giving fog signals, and proceeding at about the same rate of speed. The fog continued, and at about a quarter past 2 the lookout, stationed on the forecastle head, reported a faint whistle nearly ahead, a little to the port, and the Mina altered her course about 3 points to the southward, further away from the most frequented course of ships bound to Gibraltar. That after an interval of about two minutes, this whistle was again reported, and heard 3 or 4 points on the port beam, and the ship, while on a course about southeast by east, ordered her engines stopped, and continued blowing her fog signals. That in a few minutes, estimated from three to six by the lookout and master, respectively, two whistles were heard abeam of the Mina's port side, when she altered her course slightly to starboard, and in about two minutes the Attualita appeared bearing on the Mina's bridge, her lights,

white, red, and green, showing, and at a distance of about two ship's lengths away, proceeding at a high rate of speed. The master of the Mina, believing that to be the best way to escape·from what he deemed inevitable collision, rang his engines full speed ahead, and put his helm hardastarboard, with a view of throwing his stern away from the bow of the Attualita, but without avail, and the collision quickly followed.

The Attualita's statement is: That on the night preceding the collision, July 28, 1916, when abeam and about 7 miles off Cape Sacristin, on the Spanish coast, at 9:15 o'clock, she set her course for Europa Point, west of south magnetic, making at the time about 10 or 10½ knots. That her master remained on the bridge until midnight. The weather at that time was good, but a little hazy. That about 1 o'clock he was called by the second mate, on account of fog, and went on the bridge, and remained there from thence on to the collision. That he at once ordered the engines slowed, and about a quarter past 1 they were slowed down; the fog signals being regularly given. That a vessel was behind her, following, and subsequently she came up and stood by her after the collision, and all through the night. That the first known of the Mina was while the Attualita was moving about 3½ miles an hour, about 2:35 a. m., when her white light was observed on the Attualita's starboard bow about 1¼ to 1½ points, crossing the latter's bow from starboard to port, and moving rapidly a very short distance away. That she also showed her red light. That the Attualita's lookout gave one bell, indicating that she was coming on the starboard side. That the master received the report, and saw the light at the same time, having heard no fog signals ahead, and had no report of any. That signals were at once given to hardaport, and the ship's engines were put full speed astern. That appropriate signals were given, which indicated that the Attualita was changing her course to starboard, and her engines moving full speed astern; the Mina being at the time 1½ points on the Attualita's starboard bow. That, after seeing the white light, the red light ·of the Mina showed, and about a minute after seeing the white light the Attualita's master heard a weak whistle from the Mina, and she, running at full speed, quickly collided with the Attualita, striking the Mina's port side about opposite hatch No. 4. That the Mina's lick on the Attualita's port bow pulled the latter ship around to port, widening the angle of collision from 30 to 60 degrees.

There is a grave conflict in the testimony as to occurrences at the time of the collision, and to reach a correct determination of the merits of the controversy the court must largely depend upon the reasonableness and unreasonableness of the respective contentions, viewed in the light of what happened, as shown by the injuries sustained by the respective vessels and the results which followed.

Each vessel claims to have been virtually at a standstill, and that the other was running at a high rate of speed. The Attualita says that she first observed the white light of the Mina within a minute of the collision, crossing her bow from starboard to port; that she put her engines full speed astern, and her wheel hardaport, with a view of lessening the chance of collision; that the Mina, showing her red light, and while running at full speed, impaled her port quarter into the

bow of the Attualita; that, with the ships 200 feet apart and the Attualita bearing on the Mina's port bow, she had changed her course 4 points at the time the ships first came in contact, as shown in diagram A, and was pulled around from her position of 30 degrees to the position of 60 degrees, penetrating the Mina, as shown by diagram B:

The court is convinced that the collision did not and could not have occurred in the manner claimed by the Attualita. For a vessel to have passed from her starboard bow, so as to have driven her port quarter into the bow of the Attualita, causing such an injury as shown in this case, is impossible, as it also is that the Attualita could have changed her course 4 points within a distance of 200 feet, so as to have thrown her bow in a position to make possible the collision in the manner insisted upon; and the claim that the Mina impaled herself onto the Attualita's bow, and pulled her around from 30 to 60 degrees, is too highly improbable, if not impossible, to be accepted. The Aurania and The Republic (D. C.) 29 Fed. 98, 121; The Normandie (D. C.) 43 Fed. 151, 159; Knight's Modern Seamanship, c. 13, p. 189.

DIAGRAM A.

POSITION AT MOMENT OF FIRST CONTACT.

DIAGRAM B.

POSITION OF SHIPS WHEN THEY CAME TO REST AFTER COLLISION.

The character of the injury, and the result thereof to the Mina, as well as the character of the injury to the stem of the Attualita, precludes the theory that the collision could have happened as contended for by the Attualita. The testimony, in the court's view, conclusively shows that it occurred as shown by diagram C, namely, that the Attualita struck the Mina's port quarter opposite her No. 4 hatch, virtually at right angles, her headway carrying her into and practically at right angles through the Mina, across to the starboard coaming of No. 4 hatch, a distance of some 28 feet. The Attualita was made fast into the Mina, where she remained for four hours, until pulled out by the working of her own engines, aided by two government trawlers, when the Mina quickly sank. The character and extent of this crash and cut into the Mina, loaded as she was with a cargo of wheat, in bulk and in bags, could not have occurred, had not the Attualita been proceeding at a high rate of speed, and would not have occurred as it did, as demonstrated alike by the directness of the cut into the Mina and the character of the injury to the stem of the Attualita, if the Mina had not been practically at a standstill at the time, which the court finds to be the fact, and that the collision was caused by the Attualita running into and colliding with the Mina, while she was practically at rest.

DIAGRAM C.

The expert testimony as to how these vessels must have come together, as gathered from the effect upon the Attualita, tearing away her stringer beam on the port side for a distance of 30 feet from the frame of the ship, causing considerable damage to the hull of the vessel, a distance of 30 feet from the stem, and the manner in which she was made fast into the Mina, fully sustains the view taken by the court, as, indeed, it would be manifest without the aid of expert testimony. Had the Mina not been at a standstill, serious injury to the Attualita's stem, and considerable bending of the same to port, would have been inevitable; and had she been proceeding at speed, she would have been either torn to pieces, or cut entirely in two, and quickly sunk.

The suggestion that the Mina erred in putting her engines full speed ahead, instead of reversing the same, is not well taken under the facts in this case. The rule contended for generally applies, and should ordinarily be adopted; but circumstances vary the rule, and in the court's view the Mina's determination to go ahead was the wise course to pursue, and at all events, under the circumstances, it was but an error in extremis. The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 405, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Pocomoke (D. C.) 150 Fed. 193, 197. Nor should the Mina, under the circumstances of this case, be held otherwise at fault, in respect to her navigation prior to and at the time of the collision, as the court is convinced that she did all that could reasonably be required of her, after the presence of the Attualita in the fog became known. The New York & Liverpool Mail S. S. Co. v. Rumball, 21 How. 372, 16 L. Ed. 144; The Scotia, 14 Wall. 170, 192, 20 L. Ed. 822; The Umbria, supra, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; Dunton v. Allen Line S. S. Co., Ltd., 119 Fed. 590, 55 C. C. A. 541; The Belgian King, 125 Fed. 869, 875, 60 C. C. A. 451.

What is said respecting the conflict in the testimony as to the occurrences at the time of the collision is equally true of much of the testimony leading up to the accident, especially that relating to the speed of the vessels, the giving of fog signals, etc., which latter discrepancy, however, is not so material as the former, as it relates merely to incidents bearing upon, as distinguished from those that actually entered into, the collision. The correctness of the criticisms as to the speed of the vessels may, in part, be accounted for by the correct determination of the place at which the collision actually took place, as contended for by the respective parties; and the fact that the Attualita did not hear the fog signals of the Mina, preceding the collision, does not prove that they were not sounded. The Lepanto (D. C.) 21 Fed. 651, 656, 657; The Patria (D. C.) 92 Fed. 411. It may be that the fog signals that the Attualita did hear, from a vessel claimed to be behind her, were those of the Mina ahead, as it is difficult for the court to believe that there was a vessel behind her at all, for the reason, as the Attualita says, that upon the happening of the collision it remained in the vicinity of the ships in collision until early the next morning, and never made itself known, or pretended to offer assistance in response to the Attualita's repeated and earnest distress signals for help.

Moreover, the court, upon full consideration of the whole testimony, taking into account the manner and deportment of the witnesses on

the stand, the reasonableness of their statements, and the circumstances surrounding the two vessels prior to and at the time of the collision, is inclined to solve the differences, as respects the speed and fog signals, in favor of the navigators of the Mina, against those of the Attualita, though the latter were greater in number than those of the former. The mission of the Attualita was in connection with the war, which called for expedition, and as little notoriety as to her movements as possible; and her navigators gave evidence of apprehension of danger from submarines and other methods of destruction, which made it more than probable, while in the war zone, upon encountering fog, that she would have paid but little attention to the same, and have made time while her presence could not be observed. The Mina, loaded, and engaged in an ordinary mercantile pursuit, would not likely have been running such a risk. The protection afforded by the fog would rather have tended to encourage the Attualita to make time, when her presence could not be observed, than otherwise, even to incurring risk of collision. So it is, at the time of the collision, the Mina was found practically at a standstill in the water, while the Attualita was running at a speed highly reprehensible in a fog.

A decree may be entered finding the Attualita wholly in fault for the collision.