## THE BRABANDIER.

### THE L. O. STENSLAND.

#### (District Court, E. D. Virginia. September 30, 1919.)

COLLISION ☞82(2)—VESSEL FAILING TO STOP ON SIGNAL IN FOG LIABLE FOR COLLISION.

    A collision at sea at night in a dense fog between the steamships L. O. Stensland and Brabandier, on crossing courses, *held* due solely to fault of the Stensland under evidence warranting findings that the Brabandier, on hearing the fog signals of the Stensland, stopped as required by the rules and gave the prescribed signals, and that the Stensland, although hearing the signals, approached at such a speed that she struck the bows of the other vessel.

In Admiralty. Suit for collision by E. J. Saunders, master of the steamship Brabandier, against the steamship L. O. Stensland. Decree for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for the Brabandier.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for the L. O. Stensland.

WADDILL, District Judge. The steamship Brabandier, 2,467 tons net register, 300 feet long, 40 feet beam, 26 feet depth, loaded with a full cargo of 5,200 tons of grain, bound on a voyage from New Orleans, via Hampton Roads, for bunker coal, was on her way to Hampton Roads, and the Stensland, 285 feet long, 37 feet beam, and 20 feet depth, was also bound to Hampton Roads from Gibraltar. The ships came into collision in a fog, about 3:10 to 3:20 on the morning of September 22, 1916.

The evidence is that the Brabandier was on a course of northwest by west, and the Stensland on a course of southwest. One was ap-

proaching the whistling buoy off Cape Henry from the south; the other from the northeast. They each ran into the fog at about the same time, and the evidence of each steamer is that, upon entering the fog, the engines were put at half speed and later slowed down.

The case of the Brabandier is that as she approached the whistling buoy, about 2 o'clock in the morning, being in a dense fog, too early for entering Cape Henry to get a pilot, the chief officer and his stand-by man went forward to the forecastle head and got the anchor ready, preparatory to putting it over at the whistling buoy. The vessel was proceeding on a course northwest by west at slow speed, blowing her fog signals at regular intervals. She had approached so close to the whistling buoy as that the whistle of it was heard, when the signal of the Stensland was heard off the starboard beam, some distance away. Immediately upon hearing the signal, the engines of the Brabandier were stopped, and she then changed her signal from one prolonged blast to two prolonged blasts, indicating a vessel not under way—under way, but not making headway. She continued to blow this signal for some minutes, when the masthead lights of the Stensland were seen off the starboard beam.

The dispute in the evidence as to what occurred is chiefly from that time on to the collision; the Brabandier's witnesses testifying that they saw the Stensland's lights in a line, indicating that she was going practically in the same direction in which the Brabandier was moving; that, after seeing the Stensland's lights, they noticed her change her course as if under a starboard helm, and shortly afterwards she threw her red light on the starboard bow of the Brabandier, and came across the starboard bow and over to the port side.

The Stensland denies that she made any such change in her course, but that she was on a southwest course from the time she got on that bearing, several hours before, until the ships were in close proximity, and she ported her helm for the purpose of swinging the other way. She admits that she heard the fog signal of one whistle from a ship that turned out to be the Brabandier, when she was a mile or more away; that she heard her change from one to two blasts of her whistle, indicating that her engines were stopped; that she heard the whistles several times before the masthead light of the Brabandier appeared in the fog some four to five ship lengths away on the port side, when she hardaported her wheel, but the Brabandier came into and struck her on the port side.

The issue between the parties is sharply drawn as to what happened immediately preceding the vessels coming together; the Brabandier's position being in effect that while at a standstill in the water, where she had been for some 10 or 15 minutes, because of hearing on her starboard bow the fog signal of another vessel, which turned out to be the Stensland, the latter ship loomed up on her starboard side, and under a starboard wheel crossed her course, striking the Brabandier's stem, causing it to twist to port, and scraped her port side against the Brabandier's beam, as a result of which she received the injury.

The Stensland says she was proceeding on a southwest course, making barely more than steerage way, having theretofore for some time

slowed down in the fog, after hearing a mile or more away the fog signals of a vessel that turned out to be the Brabandier, indicating that the same was at a standstill, when the latter vessel loomed up in the fog some four or five ship lengths away, making considerable speed; that she immediately put her wheel hard aport, and did everything possible to avert the collision, but was run into and struck by the Brabandier.

The true solution of the facts between the parties and the determination of whether the ships properly conformed to the rules and regulations prescribed for their movement in the circumstances in which they were respectively placed will alone decide the issue between them. The International Rules of Navigation applicable to vessels navigating in fog are as follows:

"Art. 15. In fog, mist, falling snow, or heavy rain storms, whether by day or night, the signals described in this article shall be used as follows, namely: (a) * * * (b) A steam vessel under way, but stopped, and having no way upon her, shall sound, at intervals of not more than two minutes, two prolonged blasts, with an interval of about one second between."

Article 16 gives the speed, and prescribes the conduct of those navigating vessels in fog, as follows:

"Every vessel shall, in a fog, mist, falling snow, or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is, over." Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 325, as amended by Act June 10, 1896, c. 401, § 1, 29 Stat. 381 (Comp. St. §§ 7853, 7854).

The evidence is undisputed, so far as the signals were concerned, that the Brabandier was conforming to subsection (b) of article 15. The Stensland's navigators all admit hearing the two signals, and the navigators of the Brabandier testify to their having been regularly given, and that their ship was at a standstill as directed by the rules. The actual movement of the ship alone seems to be in dispute, and has to be solved after full consideration of all the testimony.

The court's conclusion is that the Brabandier was doing what she naturally would have been doing to conform to this rule, prescribed for the safety of herself and other shipping, and that it is highly improbable that she would have taken the precaution to have given the two signals, indicating the fact that she was at a standstill, and then pursued the reckless course of navigating entirely to the contrary. Moreover, the general circumstances surrounding the collision, and the coming together of the ships, strongly tend to support the Brabandier. The Stensland's contention, that while she supposed the Brabandier to be at a standstill in the water, some distance away, she suddenly loomed up on her port beam, some four or five ship lengths away, making considerable speed, and that she hardaported her wheel with a view of avoiding the risk of collision, but the Brabandier nevertheless ran into and collided with her, is not supported by the testimony.

The collision could not well have occurred in the manner claimed. It is not borne out by the physical evidence of the collision on both vessels. The testimony is that the Stensland was hit on her port side first slightly forward of the bridge and about amidship; and, second, slightly abaft of amidship, receiving considerable injury from each lick. Had the Stensland been moving to starboard, as claimed by her, it would have been exceedingly difficult for the collision to have occurred in this way; and had she been struck end on, as claimed, by the Brabandier, making the speed insisted upon, the heavily laden ship would have cut well into and through the Stensland, probably sinking her at the first impact. The Brabandier's claim to the effect that the Stensland crossed her course from starboard to port, raking her port side against the Brabandier's beam, and severely twisting her stem to port, is far more likely, and is just how, in the judgment of the court, the collision was brought about.

Considering the navigation of the Stensland, it does not seem that she conformed to the rules of navigation prescribed for her movement, as she should have done under the circumstances. She makes no claim to have done anything more than slowed down and continued her navigation in the fog. It is true she claims that she was only making some three miles an hour, necessary for steerageway, but the facts do not bear her out in that respect; that is, that she was proceeding at the moderate rate of speed contemplated for her movement. She was proceeding in a dense fog, in the dead hour of the night, on the high seas immediately outside of the Virginia capes, with knowledge of the presence of other vessels around and about her, and she is in fault for having failed to so reduce her speed and conduct her navigation as to enable her to avoid collision with the Brabandier, whose fog signals she had confessedly heard after the latter ship, herself proceeding with due care and speed, if not still-dead in the water, loomed up some 1,200 to 1,500 feet away. The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Julia Luckenbach, The Indraquala (D. C.) 219 Fed. 600, 604, affirmed Indra Line v. Palmetto Phosphate Co., 239 Fed. 94, 152 C. C. A. 146; The Mina, The Attualita (D. C.) 241 Fed. 530, 534.

The court, upon the whole case, is of opinion that the Brabandier was free from fault in bringing about the collision, and that the Stensland is solely responsible therefor, and a decree so ascertaining will be entered upon presentation.