## THE WILLIAM P. PALMER.

### THE SAN RICARDO.

(District Court, E. D. Virginia. December 15, 1919.)

COLLISION 🗝39—LIABILITY OF STEAMSHIP FOR DISOBEDIENCE OF PASSING RULES.

A collision at sea, on a moonless, but clear, night, between two steamships navigating without lights and approaching nearly end on, *held* due solely to the fault of one in failing to sooner see the other, at least as soon as she flashed on her lights when half a mile distant, and to alter her course to starboard as required by international rule 18, and as was done by the other vessel.

In Admiralty. Suit for collision by P. Arentson, master of the steamship William P. Palmer, against the steamship San Ricardo, with cross-libel. Decree for libelant.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for the William P. Palmer.

Hughes, Little & Seawell, of Norfolk, Va., for the San Ricardo.

WADDILL, District Judge. The collision, the subject of this litigation, occurred off the North Carolina coast, 20 miles north of Hatteras, and some 16 miles out from Wimble Shoals buoy, about 9:15 o'clock on the night of September 1, 1918.

The William P. Palmer, an ocean-going American steamship, 2,-295 tons gross, 242 feet long, and 42 feet beam, bound from Hampton Roads for Cuba, loaded, came into collision with the San Ricardo, a large British steamship, 3,927 tons, 420 feet long, and 54 feet 7 inches beam, coming up the coast en route from Mexico to England, via Hampton Roads, loaded. Both vessels were being navigated with lights obscured; the Palmer making about 8½ knots, and the San Ricardo about 11½ knots an hour. The weather was good, no moon, but starlight, and a good night for seeing.

The Palmer's case is: That while proceeding in a southwardly direction, on a course of south by west half west, and about a mile away, and some three minutes before the collision, the San Ricardo loomed up approximately dead ahead, bearing slightly on her port bow. At the time the ship could have been seen, had its whereabouts been known, two miles away. That upon observing the ship ahead, the Palmer immediately ported, to pass port to port, and flashed on her running lights, when the vessels were about three-quarters of a mile apart. That, the San Ricardo continuing to bear upon her port beam, she hard aported, and proceeded full speed ahead, with a view of avoiding the collision, and that the running lights of the San Ricardo were flashed on when the vessels were more than half a mile away, her white and red lights being first seen, and then the green light; and shortly thereafter the San Ricardo collided with the port quarter of the Palmer, about 15 feet forward of her stern.

The San Ricardo contends: That when on a course of north 12 degrees east the Palmer suddenly appeared on her starboard bow, ap-

parently very close, showing her green light, whereupon she immediately proceeded to place her wheel to starboard, and then hard astarboard, and that prior to the collision the white and red lights of the Palmer also showed, that vessel then seeming to be swinging to starboard under a port helm. About this time the San Ricardo's master came out, and before the course of his ship had been affected by the hard astarboard order he immediately countermanded it, placed the wheel to hard aport, sounded one blast of his whistle, put his engines full speed astern, and sounded three blasts of his whistle to indicate this maneuver. The distance at which the Palmer was first observed by those on the San Ricardo is variously estimated—by the third officer, in charge of navigation, at a few seconds apart; the wheelsman, at about three to four minutes apart; and the lookout, at about a minute apart.

It will be observed that the parties are directly at variance as to the happening of the collision and what brought it about. A careful review of the testimony, in the light of the law and rules of navigation governing parties in the positions in which they were, would seem to make reasonably clear whose fault caused the collision.

It is true that at the time both vessels were being navigated under existing war regulations, without showing their running lights, which tended somewhat to confuse the navigators on each vessel; but there is no doubt from the entire testimony that there was nothing to have prevented their seeing the loom of the vessels, on a bright, starry night, such as this was, a sufficient distance to avoid the collision, if those in charge of their navigation were competent, efficient, and properly discharging their duties. The San Ricardo was seen by the Palmer certainly in ample time to have avoided her, and the former ship could have seen the Palmer in the exercise of good seamanship on the part of her navigators. The third officer of the San Ricardo tries to minimize the distance at which he first observed the Palmer. He says, first, that it was only two or three seconds before the collision; but he admits that the ship's master came out on the bridge and took charge of the navigation some eight, nine, or ten seconds after the order to hard astarboard had been given.

Taking the entire testimony of that ship, it is clear that the presence of the Palmer was known when she was approximately half a mile away, after her lights were flashed on before the collision. Moreover, it would have been impossible for those navigating the San Ricardo to have done the things they claim to have done to avoid the collision in anything like the time claimed by the ship's navigator that the other vessel was seen. Certain it is, if the Palmer was not seen, it could have been from the loom of the ship alone, by the exercise of due care on the part of those whose duty it was to be on the lookout for her, when she was at least half a mile away. The San Ricardo's helmsman perhaps overestimated the distance, when he said he made the observation three or four minutes away, and the lookout was nearer correct when he fixed it at about a minute apart. The actual time was perhaps a minute and a half, when the ships were about half a mile apart.

It is likewise apparent, as well from the lick of the collision as the circumstances surrounding the same, that the vessels did not approach each other as claimed by the San Ricardo; that is, the starboard of the Palmer bearing upon the starboard bow of the San Ricardo, showing the Palmer's green light. Had this been so, the Palmer's porting and hard aporting would have earlier brought on the collision, and the San Ricardo's master, upon reaching the pilot house, would never have countermanded the order to hard astarboard, which was just the order which should have been in process of execution, had the green light of the Palmer been showing.

The testimony sustains the Palmer's claim that the vessels approached each other end on, or nearly so; the San Ricardo bearing slightly on the Palmer's beam. The courses of the ships, one proceeding on a course south by west half west, and the other north 12 degrees east, shows this, and under International Rules of Navigation, art. 18 ("Art. 18. When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other"), the Palmer was required to do just what she did do, namely, alter her course to starboard, to the end that the vessels might pass on the port side of each other; and this rule, unlike Inland Rule, art. 18, rule 1 (Act June 7, 1897, c. 4, § 1, 30 Stat. 100 [Comp. St. § 7892]), did not require the sounding of one blast of the whistle, indicating her purpose to effect a passage of port to port.

The suggestion that the Palmer should have stopped and reversed, giving appropriate signals, instead of proceeding full speed ahead under a port helm, is likewise not well taken, as to have stopped and reversed in the position in which she was placed would have resulted in her being sooner collided with, and more dangerously injured. The Free State, 91 U. S. 201, 23 L. Ed. 299; The Republic (D. C.) 102 Fed. 997; The Attualita (D. C.) 241 Fed. 530, 534.

The navigators of the Palmer insist that the San Ricardo always bore on her (the Palmer's) port, and that the latter's green light could never have been seen, which is doubtless true, unless it be that, at the moment the Palmer flashed on her lights, for an instant the green light may have been seen; but if the Palmer immediately ported and hard aported, which was the proper maneuver for her to have made, upon observing the presence of the San Ricardo end on, or nearly so, bearing on her port bow, she did all that good seamanship required of her, and the collision inevitably occurred because the navigator of the San Ricardo improperly ordered his wheel hard astarboard instead of first to port, and then to hard aport. The physical evidences of the collision make plain that the Palmer bore and was on the port side of the San Ricardo as she claims, and not on the latter's starboard side, as contended by her, and the conduct of the master of the San Ricardo in immediately correcting the placing of the wheel to starboard, by promptly placing it to port and hard aport, shows that he quickly observed the mistake made by his navigator which brought about the disaster.

What has been said is upon the theory of the negligent navigation of those in charge of the San Ricardo, after the presence of the Palmer was seen and known to them. If they did not see the Palmer, they are equally liable for negligence in that respect. The fact that the ships were being navigated with lights obscured imposed upon them the obligation to exercise the utmost diligence to carefully look out, with a view of observing the presence of others lawfully navigating the sea.

It follows, from what has been said, that the collision was brought about solely by the negligence of the San Ricardo, and a decree so ascertaining will be entered on presentation.